**MARITZ HOLDINGS, INC., f/k/a/ Maritz Inc., Appellant,**

v.

**FEDERAL INSURANCE COMPANY, Respondent.**

**No. ED 92318.**

Missouri Court of Appeals, Eastern District, Division Four.

Sept. 8, 2009.

Motion for Rehearing and/or Transfer to Supreme Court Denied Oct. 21, 2009.

Application for Transfer Denied Dec. 22, 2009.

Lawrence Friedman, Matthew Darrough, Heather F. Counts, St. Louis, MO, for Appellant.

Gerald P. Greiman, St. Louis, MO, Jonathan A. Constine, Douglas S. Crosno, Washington, D.C., for Respondent.

ROY L. RICHTER, Judge.

Maritz Holdings Inc. ("Maritz") appeals the trial court's judgment granting summary judgment in favor of Federal Insurance Company ("Federal"). We reverse and remand for further proceedings.

## I. BACKGROUND

This litigation arises from a dispute over the scope of coverage afforded by a director's and officer's (D & O) liability insurance policy issued by Federal to Maritz. Maritz has obtained D & O insurance policies from Federal since 1985.

Headquartered in St. Louis County, Maritz is a privately held company that has always been owned by lineal descendants of its founder, Edouard Maritz. Maritz has two classes of stock. The first is Class A common stock which carries voting rights and, since 1999, has been held by members of the Maritz family only. Thus, the only persons entitled to cast votes for the Board of Directors ("the Board") since 1999 have been Maritz family members. The second is Class B common stock which has no voting rights and has been held by Maritz employees, Maritz family members, and non-profit organizations.

A brief history of the Board as well as certain Maritz family disputes is necessary in order to shed light on the current case.

As of 1995, the Board was comprised of nine directors: five outside directors with no voting rights and four Maritz family members, all of whom held Class A voting stock. The four Maritz family Board members were William Maritz ("William"), the long-time Chief Executive Officer and Chairman of Maritz, and his sons Stephen Maritz ("Stephen"), Philip Maritz ("Philip"), and Peter Maritz ("Peter"). In 1998 William, suffering from cancer, resigned as CEO and selected his son Stephen to replace him.[1] At that point in time, Philip and Peter owned approximately forty percent of the issued outstanding shares of the Class A common stock.[2] Stephen and William, together with the trusts and partnerships of which they were trustees or partners, owned approximately sixty percent of the issued and outstanding shares of Class A stock.[3] Thus, Philip and Peter remained the minority shareholders.

In 1999, Stephen, with the support of William, announced a plan for an Internet venture called "eMaritz." Without reciting too much detail, it suffices to say that Peter and Philip vehemently disagreed with Stephen and William regarding the wisdom and viability of eMaritz.

In April 2000, after Peter and Philip had made known their views regarding eMaritz, William and Stephen called a special meeting of the Class A stockholders. At the special meeting, majority holders of the Class A stock, i.e. Stephen and William, voted to reduce the size of the Board from nine members to seven. They also voted in favor of resolutions that removed Philip and Peter from the Board and eliminated cumulative voting for directors. Given Philip's and Peter's status as minority shareholders, the resolutions were adopted by a vote of 60.7% for and 39.3% against.

In October 2001, counsel for Peter and Philip sent a demand letter to the Maritz Board stating that the brothers had been wrongfully removed from their positions as directors. The letter claimed, among other things, that William and Stephen had frozen them out of a meaningful role in the Company and had unlawfully orchestrated their removal by eliminating cumulative voting. The letter demanded that Maritz either buy back Philip's and Peter's shares, allow their shares to be sold to a strategic partner, or sell the entire Company.

Pursuant to the terms of the 2001 D & O Policy in effect at that time, Maritz forwarded the demand letter to Federal as Notice of a Potential Claim. In response, Federal stated that it was "accepting this matter as notice of potential claim pursuant to the terms of the June 30, 2001 to June 30, 2002 Policy Period."

Philip and Peter subsequently filed suit against Maritz in August 2002 ("Maritz I"). Maritz I alleged that the events leading up to the filing of the petition had been part of a "longstanding scheme to quash dissent and vest control in Stephen." The petition further claimed that, as a result of action taken at the special Board meeting, Philip and Peter had been deprived of their rights as minority shareholders. Maritz I

---

1. William acted as Chairman of the Board until his death in 2001, at which point Stephen replaced him.

2. Philip and Peter own approximately 21% of the Class A voting stock outright. The other 19% is owned by eight different trusts or partnerships of which Peter, Philip, or Philip's wife, Jennifer S. Maritz, is a trustee or partner.

3. As a result of revisions to William's will and certain provisions of his trusts shortly before his death in 2001, Stephen now controls approximately 60% of the voting power of the Maritz shareholders.

sought a writ of mandamus that would compel Maritz and Stephen to produce Maritz's books and records of accounts for inspection and copying.

By letter dated August 14, 2002, Maritz officially requested insurance coverage from Federal and informed Federal that Maritz had been served with process in Maritz I. Maritz stated that its letter was intended to update and supplement the previous Notice of a Potential Claim, meaning Philip's and Peter's demand letter, that Maritz had forwarded to Federal in October 2001.

Federal responded to Maritz's request for coverage in October 2002. Federal's reply letter stated that the claim for coverage in Maritz I was "first made against the Insured (Maritz) on October 12, 2001 by letter," and therefore subject to the 2001 Policy. Because Philip and Peter, as former Maritz directors, qualified as "Insured Persons" under the 2001 Policy, Federal denied coverage on the basis that Maritz I was barred by the "Insured v. Insured" exclusion in the 2001 Policy.[4]

In September 2003, Philip and Peter dismissed Maritz I without prejudice.

In July 2003, Philip and Peter filed a second lawsuit against Maritz, Stephen, the Board of Directors and a retired director ("Maritz II"). Maritz II contained similar allegations to Maritz I, namely that Philip and Peter had been wrongfully removed from the Board of Directors. Philip and Peter claimed that William and Stephen had used their majority voting positions to unconstitutionally deprive the minority shareholders of their rights as shareholders. They further alleged that William and Stephen had unlawfully eliminated cumulative voting, reduced the size of the Board, and removed Philip and Peter from their positions as directors. Phil-

ip and Peter claimed that the removal deprived them of $30,000 per year, health care, and other benefits. Maritz II sought judicial dissolution of the Company, declaratory and injunctive relief, and damages.

Maritz then sought coverage from Federal for Maritz II. Federal again denied coverage for the same reasons it had denied coverage in Maritz I: that claims brought by Philip and Peter, Insured Persons, were barred under the "Insured v. Insured" exclusion.

In December 2004, Alice Maritz Starek ("Alice"), the sister of Philip, Peter and Stephen and the daughter of William, filed a Petition in Intervention in Maritz II "in her capacity as minority shareholder." Alice owned approximately twelve percent of the beneficial interest of the Class A voting stock of Maritz, and she served as an advisory director for a brief period during 1994–5. Alice's Petition made substantially similar claims to those alleged by Philip and Peter in Maritz I and II. Primarily, she contended that Stephen and the other Board members had engaged in a "freeze-out" campaign designed to disadvantage the minority shareholders.

In 2005 Federal also denied coverage for Alice's Petition in Intervention. Federal asserted that the 2001 Policy governed Alice's claim and that, as a former "advisory director," she also qualified as an "Insured Person" under the 2001 Policy. Thus, Federal denied Maritz coverage in all three instances on the basis that the suits were barred by the "Insured v. Insured" exclusion.

Maritz and its directors settled with Peter, Philip, and Alice in September 2006.

Federal's refusal to provide insurance coverage in the underlying lawsuits against Maritz gave rise to the instant

---

4. The Policy defines Maritz as the "Insured Organization."

litigation. Maritz filed suit against Federal[5] in the trial court in March 2007 and asserted claims for breach of contract, bad faith, and vexatious refusal to pay, and sought a declaratory judgment. Maritz's Petition asserted that the "Insured v. Insured" exclusion did not preclude coverage in the underlying suits. Maritz first asserted that Philip and Peter had filed Maritz I and Maritz II in their shareholder capacities rather than their capacities as "Insured Persons," and therefore the provision should not exclude coverage. They further argued that "insured v. insured" provisions are designed to prevent collusive lawsuits amongst insureds, and that Maritz I and II were not improperly collusive or friendly suits.

Maritz next argued that, to the extent that the "Insured v. Insured" provision did operate to exclude coverage, an exception should apply. Section 5(c)(ii) of the D & O policies states that the "Insured v. Insured" provision does not bar coverage if the claim is one "brought or maintained by an Insured Person for the actual or wrongful termination of the Insured Person." Maritz contended that Section 5(c)(ii) applied because, in Maritz I and II, Philip and Peter alleged that they had been wrongfully terminated as directors.

Federal moved for summary judgment on the basis that coverage for the suits was barred by the plain language of the "Insured v. Insured" exclusion contained in the Policy. As to the "wrongful termination" exception contained in Section 5(c)(ii), Federal argued that it did not apply because Maritz I and II were not suits for wrongful termination. Moreover, Federal argued that a wrongful termination claim was a factual and legal impossibility under the circumstances; that a claim for

wrongful termination must be predicated on an employer/employee relationship. Because Philip and Peter were directors rather than Maritz employees or officers, Federal argued that they could not have been wrongfully terminated. Federal also argued that the "Insured v. Insured" exclusion applied to bar coverage for Alice's claim. Federal claimed that the 2001 Policy applied to Alice's claim and that, as an advisory director, her Petition in Intervention was also subject to and barred by the "Insured v. Insured" provision.

The trial court granted Federal's motion for summary in January 2008 in a one-sentence order. The trial court did not state the basis for its ruling. Maritz appeals.

## II. DISCUSSION

*The Applicable Policy*

Before we may address Maritz's points on appeal, we must reconcile the parties' disagreement concerning which Policy Period applies. The parties' major dispute involves which Period applies to Alice's Petition in Intervention. Both agree that Alice's Petition in Intervention relates to and arises out of Philip's and Peter's Claims in Maritz I and II.

Maritz argues that Alice's Petition is subject to the 2002 Policy while Federal claims the 2001 Policy applies. The insurance policy provisions are written such that we must first analyze which Policy applies to Maritz I and II in order to determine which applies to the Petition in Intervention. After so doing, we agree with Federal and find that Alice's Petition, like Maritz I and II, is subject to the 2001 Policy.

---

5. To the extent that the trial court did not attach liability to Federal, Maritz asserted alternative claims against Lockton Companies of St. Louis, Inc., a licensed insurance brokerage corporation. Their rights are not at issue in this case.

The D & O policies are "claims made" policies and they cover only those "Claims first made against the Insured during the policy period." The policies define a Claim, in relevant part, as "a civil proceeding commenced by the service of a complaint or similar pleading" or "a written demand for monetary damages" against any Insured Person for a Wrongful Act. The policies also contain a Reporting and Notice section, which requires, "as a condition precedent to exercising their rights under this coverage section," that the Insureds give the Company written notice as soon as practicable of any Claim made against the Insured for a Wrongful Act. That section further states that:

> [i]f during the Policy Period ... an Insured becomes aware of circumstances which could give rise to a Claim and gives written notice ... to the Company, *then any Claims subsequently arising from such circumstances shall be considered to have been made during the Policy Period ... in which the circumstances were first reported to the Company*

(emphasis added).

■ The above provisions make clear that the 2001 Policy, effective June 30, 2001 through June 30, 2002, applies to Maritz I because Maritz first gave notice to Federal of a potential Claim by Philip and Peter during that period. That is, in October 2001, after the special Board meeting where Philip and Peter were voted off the Board, Philip's and Peter's counsel sent a demand letter to the Maritz Board. The letter alleged misconduct by Maritz and its management, and charged that Philip and Peter had been frozen out of a meaningful role in management and boxed into an unfair situation. The October 2001 letter demanded that the Board buy back the brothers' shares, resell them to a strategic partner, or sell the entire company. Maritz forwarded the demand letter to Federal and stated that the letter was intended as "notice of circumstances which could give rise to a claim by Peter and/or Philip Maritz, two shareholders of Maritz."

Thus, pursuant to the Reporting and Notice section of the 2001 Policy, Philip's and Peter's demand letter, if it did not constitute a Claim in and of itself, at the very least constituted circumstances that could potentially give rise to a Claim. As detailed by the italicized language above, the Reporting and Notice section dictates that any Claims which later arise from Notice of a Potential Claim are considered to have been made during the Policy Period in which those potentialities were first reported to Federal. Here, the circumstances that could (and did) give rise to a Claim (Maritz I) were first reported to Federal in October 2001. Thus, Maritz's Claim was first made during the 2001 Policy Period.

■ Furthermore, we believe that Maritz II and the Petition in Intervention are also subject to the 2001 Policy. Our reasoning is guided by the Interrelated Wrongful Acts section contained in the 2001 Policy. This section provides that "all Loss arising out of the same Wrongful Act and all Interrelated Wrongful Acts of any Insured Person shall be deemed one loss, *and such Loss shall be deemed to have originated in the earliest policy period in which a Claim is first made against any Insured Person ...*"

The Policy defines a Wrongful Act, in relevant part, as "any error, misstatement, misleading statement, act, omission, neglect, or breach of duty committed ... by an Insured Person ..." Interrelated Wrongful Acts are defined as "all causally connected Wrongful Acts." While Maritz I and II seek different forms of relief, both suits allege the same Wrongful Acts and

breaches of duty by the majority share-holders. Furthermore, Philip's and Peter's grievances in both cases stem from the special Board meeting, where the majority shareholders eliminated cumulative voting, reduced the size of the Board, and removed Philip and Peter from the Board of Directors. Thus, the Wrongful Acts that Philip and Peter alleged in Maritz I and Maritz II were clearly "causally connected," and in fact arose out of the same nexus of conduct. Therefore, Maritz II, like Maritz I, is deemed "first made" during the 2001 Policy Period.

Federal and Maritz both agree that the Claims contained in Alice's Petition in Intervention relate to and arise out of Philip's and Peter's Claims in Maritz I and II. Therefore, pursuant to the Interrelated Wrongful Acts provision, her claim was "first made" during the same policy period that Philip's and Peter's claims were "first made." Alice's Petition, like Maritz II, relates back to the 2001 Policy.[6]

*The Relevant Law*

Our review of the trial court's grant of summary judgment is essentially de novo. *ITT Commercial Fin. v. Mid–America Marine Supply*, 854 S.W.2d 371, 376 (Mo. banc 1993). Summary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Id.*; *see also*, Rule 74.04(c). "The interpretation of an insurance policy is a question of law that this Court also determines

de novo." *Seeck v. Geico Gen. Ins. Co.*, 212 S.W.3d 129, 132 (Mo. banc 2007).

 The rules of contract construction govern insurance policies. *Versaw v. Versaw*, 202 S.W.3d 638, 643 (Mo.App. S.D. 2006). "The cardinal rule in the interpretation of a contract is to ascertain the intention of the parties and to give effect to that intention." *Burrus v. HBE Corp.*, 211 S.W.3d 613, 616–7 (Mo.App. E.D.2006) (quoting *J.E. Hathman, Inc. v. Sigma Alpha Epsilon Club*, 491 S.W.2d 261, 264 (Mo. banc 1973)). The key to interpreting an insurance policy is to determine whether the policy's language is ambiguous or unambiguous. *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Maune*, 277 S.W.3d 754, 757 (Mo.App. E.D.2009). Ambiguous policy language must be construed against the insurer, especially when insurance "is first 'granted' and is then followed by provisions limiting or avoiding liability." *Id.* (quoting *Irelan v. Standard Mut. Ass'n of Cassville*, 379 S.W.2d 815, 819 (Mo.App. S.D.1964)).

 In determining whether a contract is ambiguous, the trial court must consider the whole document and the natural and ordinary meaning of the language. *Teets v. Am. Family Mut. Ins. Co.*, 272 S.W.3d 455, 462 (Mo.App. E.D. 2008). Where a policy is ambiguous, a court may resort to extrinsic evidence to resolve the ambiguity. *Burrus*, 211 S.W.3d at 617. A contract is ambiguous when it is reasonably susceptible to differing constructions. *Id.* Said another way,

---

6. We pause here to note that we have considered Maritz's argument that the 2002 Policy applies to Alice's claim and find it unavailing. The policy section that Maritz cites for support is an exclusionary provision which Federal clearly intended to prohibit policy "stacking." Maritz cannot use an exclusion in one policy in order to create coverage in another. *See Transp. Indem. Co. v. Teter*, 575 S.W.2d 780, 784 (Mo.App. W.D.1978) (stating that an

exclusion provision of an insurance policy "has no function to endow coverage but rather limits the obligation of indemnity"). Furthermore, the 2001 Policy clearly defines "Insured Persons" to include former advisory directors. When the policy language is unambiguous, we will not resort to extrinsic evidence. *Finova Capital Corp. v. Ream*, 230 S.W.3d 35, 48 (Mo.App. S.D.2007).

an ambiguity arises in an insurance policy when "due to duplicity, indistinctness, or uncertainty in the meaning of the words used, the policy is reasonably open to different constructions." *Nat'l Union Fire Ins.*, 277 S.W.3d at 758 (citing *Farm Bureau Town & Country Ins. Co. of Mo. v. Barker*, 150 S.W.3d 103, 106 (Mo.App. W.D.2004)). However, a contract is not rendered ambiguous merely because the parties disagree on the meaning of its terms. *Burrus*, 211 S.W.3d at 617. Whether a contract is ambiguous and the interpretation of the contract itself are issues of law that this Court reviews de novo. *Teets*, 272 S.W.3d at 462.

*Maritz's Points on Appeal*

In its first point on appeal, Maritz argues that the trial court erred in granting summary judgment for Federal because the underlying lawsuits were claims for "wrongful termination" and therefore the "Insured v. Insured" provision did not operate to exclude coverage. Maritz argues that, at a minimum, there were genuine issues of material fact regarding the meaning of the phrase "wrongful termination" as used in the Policy, and therefore summary judgment was improper. We agree.

The Exclusions section of the 2001 Policy states in relevant part that Federal "shall not be liable for Loss on account of any Claim made against any Insured Person brought or maintained by or on behalf of any Insured Person." However, section 5(c)(ii) of the Policy affords an exception to the "Insured v. Insured" exclusion for those Claims that are "brought or maintained by an Insured Person for the actual or alleged wrongful termination of the Insured Person." Thus, should an Insured Person allege that Maritz wrongfully terminated him or her, that Claim would not

be barred by the "Insured v. Insured" provision.

The parties do not dispute that Philip and Peter, former directors, and Maritz, the Insured Organization, all qualified as "Insureds" within the meaning of the policy. Their primary disagreement concerns whether the "wrongful termination" exception to the "Insured v. Insured" exclusion from coverage applies in this case.

We find that the term "wrongful termination" is ambiguous because the parties have presented two plausible constructions for the phrase.

Federal's argument centers on the plain language of the policy. First, Federal suggests that Philip and Peter did not even assert claims for wrongful termination in Maritz I and II, the underlying litigation. According to Federal, Maritz I sought to compel production of Maritz's books and account records while Maritz II made claims for corporate dissolution, declaratory relief, oppression, and specific performance of a stock option. Federal further argues that, given the circumstances, Philip and Peter could not have asserted claims for wrongful termination; that such a claim was a "factual and legal impossibility." In support, Federal urges that the phrase "wrongful termination" is synonymous with "wrongful discharge" and that such a claim can only lie where there exists an employer/employee relationship. Because Philip and Peter served only as directors and never as Maritz employees or officers, Federal argues they could not have been wrongfully terminated.

Maritz argues that the term "wrongful termination" is ambiguous at best. Maritz first asserts that Federal wrongfully construes the phrase "wrongful termination" to mean "wrongful termination *from employment*," and that Federal cannot graft that requirement onto the phrase after the

fact. Maritz suggests that, had Federal intended to allow claims for wrongful termination from employment only, Federal should have so stated in the policy. Furthermore, Maritz argues that Federal "did not and cannot" argue that a layperson would understand the "wrongful termination" clause to cover only claims for wrongful discharge from employment. Maritz argues that Philip and Peter did, in fact, assert claims for wrongful termination in Maritz I and II. Finally, Maritz attempts to use extrinsic evidence, including evidence of prior dealings, in order to demonstrate that the parties did not intend to exclude coverage for claims such as Maritz I and II.

The phrase "wrongful termination" is not defined in the Policy and, as discussed, the parties present two reasonable constructions of the term. On one hand, those who are familiar with employment law understand that a wrongful discharge cause of action requires an employer/employee relationship. What meaning a layperson, presumably *un* familiar with employment law, would attribute to the phrase "wrongful termination," however, is not clear to us. In determining whether an ambiguity exists, we must give words their "plain and ordinary meaning as understood by a reasonable, average person." *Topps v. City of Country Club Hills*, 272 S.W.3d 409, 416 (Mo.App. E.D.2008).

Even if we were to assume that the parties intended the phrase "wrongful termination" to require an employer/employee relationship, whether a director's relationship to his or her company meets that requirement further confuses the issue. No Missouri court has addressed this exact question and it is not apparent that any other jurisdiction has, either. In certain respects directors and employees are inherently dissimilar because directors, generally speaking, oversee the company's activities and its management. Like employees, however, Philip and Peter alleged that they were deprived of $30,000 per year, health care coverage and other benefits when they were removed as directors. In short, the meaning of the phrase "wrongful termination" is not clear from the plain language of the Policy.

Summary judgment is only appropriate in contract cases where there is no ambiguity and the apparent meaning of the terms can be determined within the four corners of the document. *Chadwick v. Chadwick*, 260 S.W.3d 421, 425 (Mo.App. S.D.2008). Where, as here, the contract is ambiguous, "the intent of the parties must be established by extrinsic evidence and so a question of fact arises as to the intent of the parties to its meaning; thus, it is error to grant summary judgment." *Id.* In fact, where the parties disagree on the meaning and effect of the contract, and parol evidence is required, a motion for summary judgment based on interpretation of the contract should be denied. *Essex Dev., Inc. v. Cotton Custom Homes, L.L.C.*, 195 S.W.3d 532, 535 (Mo.App. E.D.2006). Determination of the parties' intent should be left to the jury. *Id.*

The trial court's grant of summary judgment in favor of Federal was erroneous given the factual dispute concerning the meaning of the term "wrongful termination." While we agree with Maritz that the Policy is ambiguous, we are not prepared to strictly construe the contract in Maritz's favor. Rather, we merely conclude that the ambiguity creates a genuine issue of material fact which makes summary judgment improper. Due to the ambiguity surrounding this term, on remand the trial court shall permit the parties to present parol and extrinsic evidence of their intent. *Monsanto Co. v. Garst Seed Co.*, 241 S.W.3d 401, 409 (Mo.App. E.D. 2007); *Burrus*, 211 S.W.3d at 619. Maritz

in particular has presented extensive extrinsic evidence of the parties' intent, most especially with respect to their prior dealings. In the past, the parties have not used one standard-form D & O policy, but rather have changed and added terms over the course of their relationship. While we do not consider extrinsic evidence on review of a grant of summary judgment, such evidence will be relevant on remand insofar as it evinces the parties' intent.

With regards to the 2001 Policy, the following factual determination remains to be decided by the trier of fact: whether the parties intended the "wrongful termination" exception to the "Insured v. Insured" exclusion to apply to the circumstances and claims presented in the underlying litigation. The resolution of this issue will determine coverage, or lack thereof, for Alice's Petition in Intervention. Should the trier of fact determine that the "wrongful termination" exception applies to Maritz I and II and that Maritz is therefore entitled to insurance coverage for those suits under the 2001 Policy, then the Petition in Intervention will likewise be entitled to coverage. This result is commanded by the fact that Alice's Petition in Intervention contains allegations which both Maritz and Federal agree relate to Philip's and Peter's claims in Maritz I and II. Given that Alice also qualifies as an "Insured Person" under the 2001 Policy, her position is identical to that of Philip and Peter. Point one is granted. Having granted Maritz relief on this point, we need not consider points two and three.

### III. CONCLUSION

The trial court's judgment is reversed because the court erred in granting summary judgment in favor of Federal. We reverse the trial court's judgment and re-mand for a trial on the factual issues discussed herein.

KURT S. ODENWALD, P.J., and GEORGE W. DRAPER III, J., concur.