**PENN–STAR INSURANCE CO., Respondent,**

v.

**Jacob GRIFFEY, Appellant.**

**No. WD 70031.**

Missouri Court of Appeals, Western District.

Jan. 19, 2010.

Motion for Rehearing and/or Transfer to Supreme Court Denied March 2, 2010.

Application for Transfer Denied April 20, 2010.

593

Bruce B. Brown, Kearney, MO, for appellant.

Michael Hufft, Kansas City, MO, for respondent.

Before ALOK AHUJA, P.J., JAMES M. SMART, JR., and LISA WHITE HARDWICK, JJ.

JAMES M. SMART, JR., Judge.

Jacob Griffey appeals a judgment in favor of Penn–Star Insurance Company declaring that Griffey's personal injury claim against BJB Liberty, L.L.C., was excluded from coverage under its commercial liability insurance policy. The judgment is reversed.

## Background

On April 7, 2004, Jacob Griffey was at a bar in Liberty, Missouri, known as The Pub House. The bar was operated by BJB Liberty, LLC. Griffey and another bar patron began arguing. Two bouncers escorted Griffey from the bar, taking him outside. Following a discussion, the bouncers allowed Griffey back in. Thereafter, Griffey and the other customer began arguing again. At that point, a bouncer approached Griffey from behind, placed his arm around Griffey's neck, and lifted him off the floor, carrying him toward the door. The chokehold cut off Griffey's air supply. Unaware that Griffey had lost consciousness, the bouncer then carried Griffey outside and placed him on the sidewalk. When the bouncer released Griffey, Griffey fell and struck his head on the sidewalk. He suffered an epidural hematoma which required surgery.

Griffey made a claim against BJB Liberty, L.L.C., for bodily injuries and medical expenses. BJB (hereafter generally referred to as "The Pub House") notified its commercial liability insurance carrier, Penn–Star Insurance Company, about the claim.

On March 3, 2005, Penn–Star sent The Pub House a letter advising that while "there may not be coverage," Penn–Star would perform an investigation under a complete reservation of rights.

In a subsequent May 25, 2005 letter, Penn–Star told The Pub House it had received "notice of a claim alleging negligence arising out of a physical altercation" in which The Pub House's bouncer, "while escorting Mr. Griffey out of the establishment . . ., had him in a choke hold, and once outside, let go, and Mr. Griffey fell backwards onto the sidewalk, causing him personal injury." Citing an exclusion for injuries resulting from "an assault and battery or physical altercation," Penn–Star

stated that there was no coverage for the claim under the policy.

On August 24, 2005, Griffey filed a petition for damages against The Pub House, alleging:

4. That another patron [of The Pub House] initiated a verbal disagreement with the Plaintiff, Jacob Griffey.

5. That unknown employee(s) of the Defendant, The Pub House, acting in the course and scope of their employment, grabbed the plaintiff, Jacob Griffey, from behind and lifted him off of the floor.

6. That the unknown employee(s) had his arm around Plaintiff's neck and chest and carried Plaintiff out of The Pub House.

7. That the unknown employee in holding Plaintiff around the neck cut off Plaintiff's air supply.

8. That Plaintiff, Jacob Griffey, lost consciousness and when the unknown employee placed him on the sidewalk outside of The Pub House, the Plaintiff, Jacob Griffey, fell to the sidewalk violently striking his head.

9. That the striking of his head on the sidewalk caused the Plaintiff to have an epidural hematoma which had to be surgically removed.

10. That the Defendant, The Pub House, by and through its employee acting in the course and scope of their employment were negligent in picking Plaintiff, Jacob Griffey, off the floor and holding him in such a manner that the Plaintiff was rendered unconscious.

11. Said employee was additionally negligent in failing to realize the Plaintiff was unconscious when he put Plaintiff on the sidewalk allowing Plaintiff to collapse and strike his head on the pavement.

In its answer, The Pub House denied the allegations of liability and raised various defenses, including comparative negligence. In October 2005, The Pub House sent copies of the petition and its answer to Penn–Star. It demanded a defense and agreed to accept a reservation of rights. Penn–Star declined.

In January 2006, Penn–Star filed a separate action for declaratory judgment. It sought a declaration that there was no coverage for the claim (and no duty to defend) based on exclusions for an "expected or intended injury" and for injuries from an "assault and battery or physical altercation." Penn–Star claimed Griffey had alleged that he was "battered" by employees of The Pub House. Both Griffey and The Pub House denied this assertion, referring the court to Griffey's petition, which cites negligence in picking up the plaintiff so as to render him unconscious, and in failing to realize the plaintiff was unconscious in putting him down on the sidewalk. They said that the petition (which does not allege that the bouncer committed a battery) "speaks for itself." Griffey and the Pub House denied Penn–Star's allegation that "[a]ny bodily injury ... arose from an assault or battery or physical altercation," and that "[a]ny negligence claimed ... necessarily arose from the assault and/or battery."

While the declaratory judgment action remained pending, Penn–Star sent The Pub House a letter again stating that it had "analyzed the petition" and determined that Griffey's "injuries were the result of an assault and battery and/or physical altercation." Citing the "expected and intended" and "assault and battery" exclusions, Penn–Star advised The Pub House that it would not defend or indemnify because "there is no coverage for the claims."

While the declaratory action was still pending, The Pub House and Griffey entered into an agreement to limit recovery to the amount available under The Pub House's liability insurance. The parties entered into various stipulations including the fact that the bouncer's actions were negligent and that "he was not intending or expecting to injure [Griffey]."

At a hearing on November 8, 2006, Griffey and The Pub House read the stipulations into the record. Griffey and his sister also testified. Their testimony indicated that earlier that night, Griffey had gotten into an argument with another patron. At the time of the earlier incident, the bouncers "walked" Griffey outside. As a result of his discussion with the bouncers, Griffey persuaded them to allow him back in. Griffey then, he said, again got into an argument—the argument that ultimately led to his injury. Griffey's testimony and his sister's testimony at trial did not contradict the allegations of the petition in any way. Nor did the testimony show that Griffey was removed without justification.

The court entered judgment for Griffey. It found that the bouncer was negligent (1) in picking Griffey up off the floor and holding him in such a manner that he was rendered unconscious, and (2) in failing to realize that Griffey was unconscious when placing him on the sidewalk, thereby allowing him to collapse and strike his head. The court assessed damages of $200,000 against The Pub House.

The declaratory judgment action went to trial on August 27, 2007. There was no live testimony. The only relevant evidence introduced by Penn–Star consisted of the insurance policy, its three letters to The Pub House, Griffey's petition, and excerpts from the personal injury trial transcript. Griffey presented The Pub House's letter demanding a defense, his agreement with The Pub House to limit recovery, the entire court file and transcript from the per-

sonal injury action, and the requests for admissions and responses in their entirety.

The court entered judgment in favor of Penn–Star. It found, essentially, that the bouncer's act of removing Griffey from the bar *was* an assault and battery. The court opined that the bouncer's actions "were done to either cause harm or cause apprehension of bodily harm and were clearly intentional acts." The court concluded that Griffey's injuries from hitting the concrete resulted from the assault and battery and were, therefore, excluded from coverage.

Griffey appeals.

### Standard of Review

■ As in any other court-tried case, we will affirm the judgment unless it is against the weight of the evidence, it is not supported by substantial evidence, or it erroneously declares or misapplies the law. *Am. Family Mut. Ins. Co. v. Peck,* 169 S.W.3d 563, 565 (Mo.App.2005). Where resolution of the controversy involves the interpretation of an insurance policy, we give no deference to the trial court. *Id.* That is a question of law which we review *de novo. Green v. Penn–Am. Ins. Co.,* 242 S.W.3d 374, 378 (Mo.App.2007). In a case such as this, where the underlying facts are not in dispute, application of the insurance policy to those facts also is a matter of law. *See Hunt v. Capitol Indem. Corp.,* 26 S.W.3d 341, 342 (Mo.App.2000).

■ We interpret the language of an insurance policy to mean "what a reasonable layperson in the position of the insured would have thought [it] meant." *Green,* 242 S.W.3d at 383. A policy that is unambiguous must be enforced as written. *Id.* However, if the language is ambiguous, we adopt the interpretation that is most favorable to the insured. *Capitol Indem. Corp. v. Callis,* 963 S.W.2d 247, 249 (Mo. App.1997). While the claimant bears the initial burden of proving coverage, the insurer has the burden of proving that an exclusionary clause bars coverage. *Truck Ins. Exch. v. Prairie Framing, LLC,* 162 S.W.3d 64, 80 (Mo.App.2005). Because an insured purchases coverage for protection, the policy will be interpreted to grant coverage rather than defeat it. *Id.* at 86. Consequently, we construe exclusionary clauses strictly against the insurer and in favor of the insured. *Id.*

### Griffey's Arguments

Griffey argues that the court erred in finding that his injury resulted from "an assault and battery or physical altercation" and, thus, was not covered. Griffey also argues that the court was required by collateral or equitable estoppel to follow the earlier court's determination that the bouncer was merely negligent and did not intend or expect to hurt Griffey.

### Discussion

We first address whether the court erred in finding that Griffey's injuries resulted from "an assault and battery" or "physical altercation" and, thus, were excluded from coverage. *See Trainwreck West Inc. v. Burlington Ins. Co.,* 235 S.W.3d 33, 44 (Mo.App.2007) (an insurer has "two distinct duties, the duty to indemnify . . . for covered losses, and the duty to defend the insured in any lawsuit seeking damages [for] covered losses").

#### Duty to Defend

■ The duty to defend is broader than the duty to indemnify. *Id.* An insurer has a duty to defend when its "insured is exposed to potential liability . . . based on the facts known at the outset of the case, no matter how unlikely it is that the insured will be found liable." *Prairie Framing,* 162 S.W.3d at 79. An insurer's

duty to defend is determined initially by comparing the relevant policy provisions with the allegations of liability in the petition. *Id.* In addition to the allegations in the petition, the insurer must also consider other facts it knew or could reasonably have ascertained. *Id.* If the allegations and ascertainable facts establish any *potential* or *possible* coverage, then the insurer has a duty to defend. *Id.* This is true even if the petition contains other claims that would not be covered. *Id.*

■■■ In its declaratory judgment action, Penn–Star relied on two policy exclusions. The first excludes coverage for an "expected or intended injury." It states that the insurance does not apply to:

"Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

The second is an "assault and battery" exclusion, which states:

In consideration of the premium charged it is hereby understood and agreed that this policy will not provide coverage, meaning indemnification or defense costs, for damages alleged or claimed for

"Bodily Injury", "Property Damages", Personal Injury, Advertising Injury, Medical Payments or any other damages resulting from assault and battery or physical altercations that occur in, on, near or away from the insured's premises;

1. Whether or not caused by, at the instigation of, or with the direct or indirect involvement of the insured, the insured's employees, patrons or other person in, on, near of away from insured's premises, or

2. Whether or not caused by or arising out of the insured's failure to properly supervise or keep the insured's premises in a safe condition, or

3. Whether or not caused by or arising out of any insured's act or omission in connection with the prevention or suppression of the assault and battery or physical altercation, including, but not limited to, negligent hiring, training and/or supervision.

4. Whether or not caused by or arising out of negligent, reckless, or wanton conduct by the insured, the insured's employees, patrons or other persons.

These exclusions should be considered together, because they are part and parcel of the same policy. *See Williams v. Silvola,* 234 S.W.3d 396, 403 (Mo.App.2007). The "expected or intended" injury exclusion does not apply to the "use of reasonable force to protect persons or property." The plain sense of the policy language is that if a bouncer employs a reasonable degree of force to physically eject someone from the premises, the insurer cannot deny coverage on the basis that the bouncer "expected or intended" the injury, even if the bouncer intended to apply force and that force resulted in an injury. Thus, if the circumstances are such that a bouncer reasonably uses a degree of force that results in the bar patron having an arm or neck injury from the scuffle, the insurer cannot rely on the "expected on intended" injury exclusion. At the same time, the "assault and battery" exclusion would purport to exclude injuries from one bar patron attacking another, or from a bouncer attacking a customer in a way that would constitute an assault and battery. *See, e.g., Trainwreck West, Inc. v. Burlington Ins. Co.,* 235 S.W.3d 33, 37 (Mo.App.2007).

We suppose that an argument could be made that the phrase "use of reasonable force" was intended to mean something

other or something more than merely the use of a reasonable *degree* of force. It could, for instance, mean a reasonable *manner* of using force, and it could be asserted that the manner of force used in this instance was not reasonable. We think, however, that one would ordinarily think that the phrase is equivalent to the "use of a reasonable *degree* of force." In any event, any ambiguity in the phrase works to the benefit of the insured, not the insurer. *See Callis*, 963 S.W.2d at 249. We cannot say as a matter of law that petition asserted a use of force that was other than "reasonable" within the meaning of the policy language.

Griffey's petition alleged: (1) that "another patron initiated a verbal disagreement" with Griffey, (2) that an "unknown employee[ ] of ... The Pub House, acting in the course and scope of [his] employment, grabbed [Griffey] from behind and lifted him off of the floor," (3) that the employee "had his arm around Plaintiff's neck and chest and carried [him] out of The Pub House," and (4) that "in holding Plaintiff around the neck [the employee] cut off Plaintiff's air supply." The petition further alleged that Griffey "lost consciousness, and when the unknown employee placed him on the sidewalk ..., [he] fell to the sidewalk violently striking his head," and that the "striking of his head on the sidewalk caused [his injury]." Griffey alleged that the employee was "negligent in picking Plaintiff ... off the floor and holding him in such a manner that [he] was rendered unconscious" and "in failing to realize the Plaintiff was unconscious when he put Plaintiff on the sidewalk, allowing [him] to collapse and strike his head on the pavement." While the petition alleges that an employee of

The Pub House "picked up" Griffey in an effort to forcibly remove him, the petition does not allege that the degree of force used was unreasonable under the circumstances.[1] Nor does it allege that the attempt to forcibly remove Griffey constituted a battery. The petition, in other words, does *not* assail the bouncer for the decision to physically remove Griffey or for the removal itself. It assails the bouncer for negligence in cutting off the air supply, thereby inducing unconsciousness.

The Pub House's answer to the petition denied Griffey's allegations of liability. The Pub House raised defenses of contributory negligence and assumption of risk, and alleged that Griffey "acted illegally" by attacking other unknown persons.

In its three letters to The Pub House, Penn–Star did not assert knowledge of any facts beyond those contained in the petition and answer. Also, at the trial on the declaratory judgment action, Penn–Star presented no evidence that it had knowledge of any facts beyond those pleaded in the petition and answer.

We note that many "duty-to-defend" cases in this context deal only indirectly with the issue of what constitutes an assault and battery. This is because the allegations set forth in the petitions in those cases clearly alleged an assault and/or battery, and the focus was on whether negligence claims "arising out of" the alleged assault and/or battery also were barred by the exclusion. *See, e.g., Penn–Am. Ins. Co. v. The Bar, Inc.*, 201 S.W.3d 91, 96 (Mo.App.2006) (plaintiff alleged a "battery" by bouncer; at issue was plaintiff's alternative claim of negligence); *Callis*, 963 S.W.2d at 249–50 (plaintiff al-

---

1. The fact that the petition alleged that the dispute was "initiated" by another bar patron does not equate to an assertion that the bouncers were negligent in removing Griffey because it does not logically follow that a person who did not *initiate* the dispute cannot be the one to most seriously threaten the peace and safety of the establishment.

leged an "assault and battery" by a bar employee; at issue was a "negligent failure to protect" claim). Those cases held that the negligence claims were barred.

One case that does address the specific question of whether the allegations in the petition and other known facts constituted an assault and battery is *Trainwreck West Inc. v. Burlington Ins. Co.*, 235 S.W.3d 33, 37 (Mo.App.2007). That court found that the assault and battery exclusion barred coverage for the claim of a female nightclub patron who alleged that she was hurt as a result of a bouncer pushing her with "excessive force or otherwise unnecessarily, causing her to fall." *Id.* The petition claimed that the bar failed to fulfill its duty to protect her from foreseeable "attacks" by bouncers. *Id.* at 37, 42. The petition further alleged that a nightclub employee "committed a battery upon [the plaintiff] by pushing her and causing her to fall." *Id.* at 37. In addition, the court cited various documents that the nightclub had sent to its insurer indicating that the doormen had "pushed" the claimant and her friends out the door. *Id.* at 42. The appellate court concluded that the allegations in the petition, taken together, as well as the facts known to the insurer when it denied coverage, established a claim "clearly within the 'assault or battery' exclusion." *Id.* The court also found, in that case, that the injured patron's negligence claims *arose from* the assault and battery and, thus, also were excluded. *See id.* at 44–45.

Similarly, in *Acceptance Insurance Co. v. Winning Concepts of Westport, Inc.*, 842 S.W.2d 206, 207 (Mo.App.1992), the petition alleged that restaurant employees "willfully, maliciously, and without any just cause or provocation on the part of Plaintiff assaulted and battered Plaintiff by repeatedly striking and beating Plaintiff about his face and repeatedly kicking Plaintiff in the stomach and ribs." The court held that because of the language of the petition the assault and battery exclusion applied, excluding a negligence claim arising out of the assault and battery. *Id.* at 208. In this case, in contrast to *Trainwreck* and *Winning Concepts,* as we have noted, there is no allegation that Griffey was attacked or assaulted or that there was any malicious or hostile motive on the part of The Pub House. In our analysis of the duty to defend, we are constrained to refer to the petition without reading into it any factual assumptions. Here, there is no allegation of a "battery," or an "attack" by a bouncer, or the "use of unreasonable force." Nor has the insurer shown that it was in possession of additional information (beyond the petition) showing that the bouncer acted with unreasonable force, or that the bouncer expected or intended to cause unconsciousness, or that the bouncer "attacked" Griffey, or that the bouncer otherwise committed an assault and battery. Griffey alleged only that the bouncer was negligent. The allegations and surrounding facts fail to demonstrate that the bouncer's actions were an "assault and/or battery."

It cannot be said that the physical removal of an unruly patron is *by definition* an assault and battery. *See Peck v. Alliance Gen. Ins. Co.*, 998 S.W.2d 71, 73 (Mo.App.1999) (where the court found that an assault and battery exclusion did *not* bar coverage for a patron's injuries when he fell to the ground after bouncers held the patron's arms and hands above his head in a "full nelson," escorted him outside, and released him).

A proprietor is permitted to use reasonable force to eject a person whose permission to be on the premises has been revoked. *See* 6A C.J.S. *Assault* sec. 32 (2004). Although ordinarily the proprietor must first request that the patron leave and give an opportunity to leave, there are

occasions in which it would be useless or dangerous to wait for the person to remove himself. *Id.* A proprietor indeed may have a duty to eject an unruly patron and may face liability for failure to do so. *See* Annotation, *Tavernkeeper's Liability to Patron for Third Person's Assault*, 43 A.L.R.4th 281, sections 3[a]–8[b] (1986).

■ Penn–Star says that even if there was not an "assault and battery," there was a "physical altercation" requiring the application of the exclusion. Like any other contract, the words used in an insurance policy "are given their ordinary, everyday meaning unless it is evident that a technical meaning should apply." *The Bar*, 201 S.W.3d at 96. We interpret insurance policy language to mean "what a reasonable layperson in the position of the insured would have thought [it] meant." *Green*, 242 S.W.3d at 383. The policy does not define "physical altercation," and we do not find a case in Missouri that interprets this phrase in the context of a liability insurance policy.[2]

Ordinary logic would dictate that the phrase "physical altercation" cannot be understood by a reasonable person reading the policy to include the "use of reasonable force to protect persons or property." That is because the policy specifies that the "use of reasonable force to protect persons or property" is an *exception* to the "expected or intended" *exclusion*. Therefore, the use of reasonable force would be understood as remaining within coverage. There would be no reason to specify it as an exception to that exclusion if the company proposed to rule it out under a *different* exclusion. To say it another way, there would be no reason in the "expected or intended" exclusion to even mention that the use of reasonable force would be

permissible within coverage. Thus, the reasonable reader of the policy would believe that there *is* coverage for liability claims arising out of the use of reasonable force to protect persons or property.

Moreover, the ordinary everyday meaning of "physical altercation" is not generally understood to include the physical removal of an agitated bar patron by an authorized person. "Altercate" means "to dispute with zeal, heat, or anger," and "altercation" is defined as "a noisy or angry dispute." WEBSTER'S SEVENTH NEW COLLEGIATE DICTIONARY 25 (1971). These definitions indicate that in a "physical altercation," there is heated, angry physical contact between the participants, as in a personal fight. The bouncer who is merely doing his job is presumably not personally hostile to the bar patron he seeks to control and remove. When a police officer physically ejects an unruly patron, or makes an arrest, the police officer presumably is merely doing his job, and we might think it strange to refer to the officer as "altercating." So it is with an authorized bouncer.

We conclude that the allegations as to the actions taken by the bouncer—*i.e.*, approaching Griffey from behind, placing his arm around Griffey's neck and chest, and lifting him off the floor in order to carry him outside—did not describe a "physical altercation" within the meaning of the policy.

There was no evidence or allegation that the bouncer's actions "were done to either cause harm or cause apprehension of bodily harm," as the trial court believed. The allegations and other ascertainable facts do not indicate that the bouncer had a conscious intent to cause Griffey harm. Rath-

**2.** *Cf. The Bar*, 201 S.W.3d at 93, 97 and *Green*, 242 S.W.3d at 382–83, where "physical altercation" was part of the assault and battery exclusion. But its meaning was not at issue because in both cases there was an actual assault and/or battery.

er, they show an intent to remove Griffey from the premises in order to stop a confrontation between two patrons. Neither the petition nor any other information available to Penn–Star showed or even alleged that the bouncer acted improperly or inappropriately in seeking to remove Griffey. The only fault alleged was the bouncer's fault in negligently holding Griffey so as to cut off his air supply, without the bouncer realizing that he had done so.

The insurance policy could easily have included a provision stating that the policy does *not* provide liability protection as to the use of *any* force to remove patrons or protect persons or property and that a special rider must be purchased at an additional premium to obtain such coverage. Had the policy so specified, at least The Pub House would have been on notice that the policy was not purporting to provide coverage such as that at issue in this case.

The petition, according to its plain meaning, did not assert facts indicating that the bouncer's removal of Griffey from the bar was unjustified, an "assault and battery." [3] Nor did it assert facts indicating that the removal was a "physical altercation." Because Penn–Star did not show that it had any information demonstrating that there *had been* an assault and battery or a physical altercation out of which the injury arose, there was a duty to defend. Penn–Star breached that duty. *See Whitehead v. Lakeside Hosp. Ass'n,* 844 S.W.2d 475, 481 (Mo.App.1992).

### *Duty to Indemnify*

In this declaratory judgment action, the issue of duty to indemnify is distinct from the duty to defend. *See Prairie Framing,* 162 S.W.3d at 80. "The duty to indemnify is determined by the facts as they are established at trial or as they are finally determined by some other means, [such as] summary judgment." *The Bar,* 201 S.W.3d at 98.

At the hearing in the underlying tort case, the parties' stipulations were read into the record. Those stipulations were that The Pub House's employee, acting in the course and scope of his employment, "picked [Griffey] up off the floor," "did not realize that he had cut off [Griffey's] air supply," and "did not realize that [Griffey] had lost consciousness." The parties further stipulated that "when [the employee] placed [Griffey] on the sidewalk, [Griffey] fell and hit his head," and that the employee's "actions were negligent and he was not intending or expecting to injure [Griffey]."

Griffey said the bouncer "took force and removed me from the facility" when "he came up behind me with no warning and grabbed me around . . . my throat with his arm in a choke hold, picked me up off the ground" and took Griffey outside. Griffey said "two of them . . . forcefully took me out." He did not know how he got on the sidewalk. He said he "was unconscious and the next thing I remember, I woke up on the concrete." He said that the bouncers did not "in any fashion beat him or hit him."

Griffey's sister testified that she saw the bouncer carrying her brother by the throat and that she stepped back to let them

---

**3.** The testimony of Griffey at the tort hearing that the bouncer grabbed Griffey "with no warning" may have seemed to the trial court to establish an "assault and battery." The *petition,* however, did not assert that there was "no warning" and did not assert that a warning would have sufficed to avoid the necessity to physically remove Griffey. We do not read the petition with an overlay favorable to the insurer; and in determining the duty to defend, we do not read the petition in the light of information learned later, such as information presented at the tort hearing.

pass. As he passed, she saw that Griffey's "eyes were kind [of] glazed over and he had kind [of] a blank stare on his face." She saw that he was off the floor and that "his eyes started to roll back once he walked out the door with them." She stated that Griffey was not fighting with the bouncers in any fashion. She said that they did not throw him, kick him, or use any force other than lifting him off the ground. She was not able to see her brother as the bouncers took him outside, but when she got outside, he was on the ground. She did not see how he got on the ground.

The relevant testimony at the tort case trial in no way contradicted the petition or added facts necessarily indicating the absence of coverage. The facts brought out in the tort case essentially confirm the accuracy of the allegations of the petition, while adding some detail. Penn–Star seizes upon the fact that Griffey testified that the bouncer grabbed him from behind "with no warning." However, common sense indicates that sometimes the hostilities in an argument will have advanced to the point that it is far safer for a bouncer *not* to first give a warning, but rather to utilize surprise to squelch imminent violence. *See* 6A C.J.S. *Assault* sec. 32 (2004). Here Griffey admitted at the tort hearing that the bouncers removed him from the bar earlier; and that after his discussion with them, they agreed to allow him back in. The record does not disclose what warnings the bouncers gave him at that time, or what conditions they placed upon allowing him back in. We do not know whether they allowed him back in only conditionally; and we do not know whether they warned him that the next time they have to remove him, they might not be very genteel in their actions. Nor do we know whether the circumstances would have indicated to the bouncers the need for immediate physical intervention.

Without knowing more of the circumstances, we know only that it conceivably *could have been* an "assault and battery" to remove Griffey without warning. But we do not know that it *was* an assault and battery. Penn–Star failed to demonstrate that the actions of the bouncers constituted an "assault and battery."

Because the evidence presented at the declaratory trial was undisputed as to its basic facts, there was substantial overlap in this case between the duty to defend and the duty to indemnify. Accordingly, we need not address or consider the arguments by Griffey as to the extent of the preclusive effect of the determinations in Griffey's tort action against The Pub House.

The facts submitted in this case are quite similar to those in *Peck*, 998 S.W.2d 71. Peck was an equitable garnishment action in which the dispute also involved an assault and battery exclusion. The plaintiff in *Peck*, also a bar patron, alleged that he had approached the disc·jockey and "suggested" that the disc jockey change "the type of music that was playing." *Id.* at 73. He alleged that he "started to reach for the music equipment," and, as he did so, he was touched by a bouncer and two other doormen who escorted him out. *Id.* The bouncer allegedly held plaintiff's arms and hands above his head in a "full nelson," escorted him outside, and released him. *Id.* Plaintiff fell to the pavement after being released. There was no assertion that the bouncer shoved or pushed plaintiff down on the pavement. *Id.* The appellate court affirmed the trial court's determination that the "assault and battery" exclusion was not applicable. *Id.* The court said the allegations showed "that plaintiff was injured as a result of falling after being escorted to the outside [and] released by one of insured's employees and not from being thrown, pushed, or

shoved" down. *Id.* at 74. The court found that these facts "[did] not reasonably support an inference that plaintiff's injuries were caused by an assault, battery, or harmful or offensive contact." *Id.* at 74–75. The court thus impliedly recognized that the use of the "full nelson" to remove a bar patron to protect persons or property was not an "assault" or a "battery." The court held that the assault and battery exclusion did not bar coverage. *Id.* at 75. Penn–Star offers no basis for distinguishing *Peck,* and we see no reason to believe that *Peck* is not good law.

This case, instead of a traditional full nelson, involved a maneuver of grabbing Griffey across the neck and lifting him off the floor. Whether that was any kind of recognized maneuver we do not know, but if so, it was poorly executed. It *was* effective in eliminating Griffey's resistance and thereby reducing the risk to other patrons while removing Griffey, but the problem was that the maneuver was performed in such a way as to cut off Griffey's air supply.

One might *assume* that the bouncer exercised bad judgment in evaluating Griffey as a threat (and we suspect that the trial court so believed), and might therefore *assume* that the bouncer should not have acted so precipitously in trying to remove him. But that is nothing more than an *assumption.* Griffey never made *any* such allegation nor offered background facts to make that clear; and Penn–Star never proved that such was the case. It is entirely possible, in accordance with the language of the petition and the facts presented in both the tort case and the declaratory action, to believe that the bouncer may have exercised abundant patience and discretion consistent with safety in deciding *how long* to tolerate Griffey's presence in the bar.

In this case, there was no evidence presented either at the personal injury trial or at the declaratory judgment hearing demonstrating that Griffey's injury arose from an "assault and battery" or "physical altercation" so as to exclude coverage. Penn–Star chose to believe facts that were neither asserted in the petition nor demonstrated as fact. Penn–Star breached both the duty to defend and the duty to indemnify.

### Conclusion

The judgment is reversed, and the case is remanded for further proceedings consistent with this decision.

All concur.