**NATIONAL BEEF PACKING COMPANY, L.L.C., and National Carriers, Inc., Appellants,**

v.

**ZURICH AMERICAN INSURANCE COMPANY, Respondent.**

No. WD 72267.

Missouri Court of Appeals, Western District.

March 15, 2011.

Rehearing Denied May 3, 2011.

Rex A. Sharp and Barbara C. Frankland, Prairie Village, KS, for Appellants.

Larry D. Fields, Bradley J. Baumgart, and Scott E. Harvison, Kansas City, MO, for Respondent.

Before Division I: MARK D. PFEIFFER, Presiding Judge, and THOMAS H. NEWTON and ALOK AHUJA, Judges.

MARK D. PFEIFFER, Presiding Judge.

National Beef Packing Company, L.L.C., and National Carriers, Inc.,[1] appeal from the judgment of the Circuit Court of Jackson County granting Zurich American Insurance Company's ("Zurich") motion for summary judgment and denying appellants' summary judgment motion as it relates to the interpretation of an insurance policy issued by Zurich to National. Finding no error, we affirm.

## Statement of Facts

The facts, in the light most favorable to the non-moving party, *ITT Commercial Fin. Corp. v. Mid–Am. Marine Supply Corp.*, 854 S.W.2d 371, 376 (Mo. banc 1993), are as follows: On November 17, 2005, a driver for National hit and killed Ellen Duensing in a semi-truck/automobile accident in the state of Texas. In 2006, a wrongful death lawsuit was filed in the state of Texas in which each of Ellen Duensing's natural parents, Karen D'Amato ("Mother") and Ronald Duensing ("Father")[2] filed separate claims, individually and as heirs or representatives of the Estate of Ellen Duensing, against National for the death of their daughter (the "Wrongful Death Lawsuit").

At the time of the semi-truck/automobile accident, National was insured by a liability insurance policy issued by Zurich and for which the limit of liability for any one accident was $2 million (the "insurance contract").

The parties to the Wrongful Death Lawsuit participated in a mediation session on

---

1. National Beef Packing Company, L.L.C., is the sole shareholder of National Carriers, Inc. In this opinion, we collectively refer to these parties as "National."

2. Mother and Father were divorced at the time of Ellen Duensing's tragic death. Ellen Duensing was twenty years old at the time of her death and lived with Mother. Ellen Duensing enjoyed a close relationship with Mother prior to her death but was estranged from Father at the time of her death and rarely saw him. One of National's attorneys who coordinated the defense of the Wrongful Death Lawsuit testified by deposition that National considered Mother's claim in the wrongful death litigation much more valuable than Father's claim due to the close relationship between Mother and her daughter versus the estranged relationship that Father had with Ellen Duensing. Accordingly, at the initial mediation, discussed *infra*, National's priority was to resolve Mother's claim by settlement.

November 15, 2006. At that mediation, National and Mother agreed to a settlement of her claims[3] for the present value sum of $2.8 million, and Mother and National signed a Mediation Settlement Agreement ("MSA") memorializing their agreement. Mother executed the MSA "Individually, and as Representative of the Estate of Ellen Esther Duensing." The MSA stated that, in exchange for releasing her claims, Mother was to receive a $1.8 million cash payment and an annuity funded with $1 million. For its part, Zurich agreed that it would fund the annuity and contribute $1 million towards the cash payment, exhausting the $2 million policy limit of the insurance contract. National agreed to pay Mother the remaining $800,000 cash payment. Authorized representatives of National signed the MSA on behalf of National. The MSA required cash and annuity funding payments to be made on or before December 15, 2006.[4] In return for the payment obligations of the MSA, Mother ("Individually, and as Representative of the Estate of Ellen Esther Duensing") agreed to:

[R]elease, discharge and forever hold the other harmless from any and all claims, demands or suits, known or unknown, fixed or contingent, liquidated or unliquidated, whether or not asserted in the above case, as of this date, arising from or related to the events and transactions which are the subject of this case.

After the MSA was signed by the parties to the MSA, Father amended his claim in the Wrongful Death Lawsuit to include a claim on behalf of the Estate. National believed that the MSA terminated *both* natural parents' rights to assert claims as heirs of the Estate. Mother (and Father) did not agree with National's interpretation. The trial judge ("Texas trial judge") of the Texas trial court in which the Wrongful Death Lawsuit was pending ("Texas trial court") instructed the parties to file competing motions for summary judgment relating to any issues they wished to raise relating to the MSA and its impact on the Wrongful Death Lawsuit. In support of National's motion for summary judgment filed with the Texas trial judge in the Texas trial court, National argued, in pertinent part:

*There is no dispute between the parties as to the existence or enforceability of the [MSA].* [Mother] has stated on the record, in open court, that the [MSA] is a valid and enforceable contract between the parties. [National] agree[s] that the [MSA] is a valid and enforceable contract. In fact, both parties are seeking enforcement of the [MSA].

. . . .

*[National] [has] fully complied with all the terms of the [MSA]. . . . [National] [has] also fully funded the settlement* by the December 15, 2006 deadline.

There can be no dispute that under the express terms of the [MSA], *[Mother] agreed to "release, discharge and forever hold [National] harmless" from claims asserted by [Mother] against [National] in the [Wrongful Death Lawsuit].*

In his ruling, the Texas trial judge concluded that National's undisputed satisfaction of the payment obligations pursuant to

---

3. Father did not settle his asserted claims in the November 15, 2006 mediation.

4. On or before December 13, 2006, Zurich funded the annuity by paying $1 million to the agreed-upon structured settlement brokerage and also sent a check in the amount of $1 million to Mother's attorney.

the MSA "satisfies the claims of [Mother], both individually and with regard to her own interest in the Estate of Ellen Esther Duensing," but the Texas trial judge also concluded that Father's separate claim as a representative of the Estate survived and that Father would be permitted to assert such claim at trial. After this ruling, National did not attempt to repudiate the MSA or to otherwise seek reimbursement of the $2 million that had been paid by Zurich pursuant to the MSA.

On July 13, 2007, the Wrongful Death Lawsuit trial was completed, and the jury found in favor of Father on his individual claim only[5] and against National; on August 3, 2007, a judgment of $8.9 million was entered in Father's favor in the Wrongful Death Lawsuit. National appealed the judgment in favor of Father and summary judgment rulings by the Texas trial court.[6] While the appeal of the judgment of the Wrongful Death Lawsuit was pending, National and Father participated in another mediation session. As a result of that mediation, Father settled his claims with National for an undisclosed amount. The terms of the MSA remained unaltered. Following the settlement, National dismissed its appeal of the judgment of the Wrongful Death Lawsuit from the Texas trial court.

After Father settled, National requested that Zurich reimburse it for the $1,016,954.78 National had spent in defending the Wrongful Death Lawsuit. Litigation defense costs were defined in the insurance contract as Allocated Loss Adjustment Expenses (ALAE).[7] Zurich disagreed and countered that it was only contractually responsible for $85,916.10, half of the ALAE costs incurred as of December 13, 2006, the date upon which Zurich tendered payment of its policy limits under the insurance contract. In fact, Zurich paid $85,916.10 to National. Seeking an additional $422,562.29, which National claims to be owed pursuant to the terms of the insurance contract, National filed the underlying lawsuit against Zurich on November 7, 2007, in the Circuit Court of Jackson County ("trial court"). Both parties filed motions for summary judgment, and after a hearing on the motions, the trial court entered judgment in favor of Zurich and against National on March 11, 2010. This timely appeal followed.

### Standard of Review

When considering an appeal from summary judgment, our review is essentially *de novo*. *Larabee v. Eichler*, 271 S.W.3d 542, 545 (Mo. banc 2008). Summary judgment is only appropriate when " 'there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law.' " *Id.* (quoting *White v. Zubres*, 222 S.W.3d 272, 274 (Mo. banc 2007)); Rule 74.04(c)(6). Our review of the record is in the light most favorable to the non-moving party. *ITT Commercial Fin.*, 854 S.W.2d at 376. The facts, including all reasonable inferences

5. The jury did *not* award damages to Father as a representative of the Estate of Ellen Esther Duensing nor did it award any punitive damages.

6. As discussed *infra*, National did not and does not agree with the ruling by the Texas trial court as it relates to the survival of Father's claim as an heir, or representative, of the Estate of Ellen Esther Duensing under Texas law. However, by settling with Father during the pendency of the appeal, National dismissed its appeal and foreclosed its right to attempt to convince the appellate courts of the State of Texas otherwise.

7. National and Zurich initially disputed both the amount and the percentage of the ALAE for which Zurich was responsible. On appeal, National concedes that Zurich is only responsible for half of the ALAE.

from those facts, are viewed to the benefit of the party against whom judgment was entered. *Id.* However, after the moving party has made a *prima facie* showing that it is entitled to judgment as a matter of law, the non-moving party may not rest upon general denials but, instead, must submit competent evidence in compliance with Rule 74.04, setting forth specific facts demonstrating a genuine issue for trial. *Larabee,* 271 S.W.3d at 546.

## Analysis

■ Where, as here, resolution of the case involves the interpretation of an insurance contract, we give no deference to the trial court as contract interpretation is a question of law that we review *de novo.* *Burns v. Smith,* 303 S.W.3d 505, 509 (Mo. banc 2010); *Jones v. Mid–Century Ins. Co.,* 287 S.W.3d 687, 690 (Mo. banc 2009); *Penn–Star Ins. Co. v. Griffey,* 306 S.W.3d 591, 596 (Mo.App. W.D.2010). In the absence of a statute or public policy dictating insurance coverage, our review of whether insurance coverage is applicable is governed by a review of the underlying insurance contract. *Rodriguez v. Gen. Accident Ins. Co. of Am.,* 808 S.W.2d 379, 382 (Mo. banc 1991). In construing the language of an insurance contract, we give meaning to the language of the insurance contract which would be understood by an ordinary person of average understanding. *Seeck v. Geico Gen. Ins. Co.,* 212 S.W.3d 129, 132 (Mo. banc 2007). We are also mindful that courts are "not permitted to create an ambiguity in order to distort the language of an unambiguous policy, or, in order to enforce a particular construction which it might feel is more appropriate." *Rodriguez,* 808 S.W.2d at 382.

The insurance contract states that:

**[Zurich's] duty to defend or settle ends when the Liability Coverage Limit of Insurance has been exhaust-** **ed by *payment* of judgments or *settlements.***

(Emphasis added.)

■ In analyzing the policy in the instant case, the question before this court is whether Zurich exhausted its coverage limits "by payment of judgments or settlements" and, thus, contractually terminated its "duty to defend" when it funded the MSA with payments totaling $2 million (Liability Policy Limit) on December 13, 2006. We conclude that it did.

This case is controlled by *Millers Mutual Insurance Association of Illinois v. Shell Oil Co.,* 959 S.W.2d 864 (Mo.App. E.D.1997). In *Millers,* the court interpreted an almost identical "duty to defend" insurance provision. In *Millers,* the plaintiff sued H.T. Dunn Oil Company, Inc. ("Dunn"), and Shell Oil Company ("Shell"). *Id.* at 865. Dunn owned and operated a gas station on land leased from Shell. *Id.* The plaintiff had been raped and shot while at the gas station. *Id.* at 866. Dunn had a $500,000 liability policy with Millers Mutual Insurance Association of Illinois ("Millers Mutual") that named Shell as an additional insured. *Id.* The policy provided that Millers Mutual's duty to defend ended when its policy limits were "exhausted by payment of judgments or settlements." *Id.* at 865. In settlement negotiations, the plaintiff was willing to settle her claims against Dunn for the policy limit of the Millers Mutual insurance policy but was unwilling to consider any settlement that released Shell. *Id.* at 866. Millers Mutual attempted to convince the plaintiff to include Shell in the settlement and release, but when it was clear that plaintiff would never agree to such a settlement scenario, Millers Mutual paid its policy limits for the release of liability for Dunn. *Id.* Millers Mutual then sought and was granted a declaratory judgment finding that it did not owe Shell a duty to

defend because it had exhausted the liability coverage policy limits. *Id.* Shell appealed, claiming in part that payment of the Millers Mutual policy limits on behalf of only one of multiple insureds did not satisfy the duty of defense contractual obligation clause in the Millers Mutual insurance policy. *Id.*

In interpreting the exact same policy language as the operative policy language in the present case, the *Millers* court held that: (1) "the duty to defend is broader than the duty to indemnify only when 'the insurer had the potential obligation to indemnify'"; (2) the unambiguous language of the policy meant that Millers Mutual's good faith[8] payment of its policy limits[9] ended its duty to indemnify; and (3) because Millers Mutual no longer had a duty to indemnify (after paying its policy limits), it no longer had a duty to defend. *Id.* at 871–72 (internal citations omitted). Ultimately, the *Millers* court concluded:

> A policy may specifically provide for termination of a duty to defend upon payment of the policy limits, but public policy requires the insurer to act in good faith in the interest of all insureds under the policy. Millers acted in good faith in strictly complying with the unambiguous language of the policy issued. This is not a case in which the insurer attempted to tender the limits into court for the purpose of totally avoiding its duty to defend. Millers attempted to obtain a settlement on behalf of Shell and upon the plaintiffs' refusal, it made a reasonable settlement on behalf of the named insured for the policy limits. The unambiguous policy language allows Millers to terminate its duty to defend upon exhaustion. We hold an insurer relying on unambiguous policy language may terminate its duty to defend an additional insured when the policy limits are exhausted in a good faith settlement on behalf of the named insured.

*Id.*

Applied to the instant case:

- National does not dispute that the MSA was a valid and enforceable settlement between National and Mother. In fact, the Texas trial judge expressly stated that the MSA constituted a settlement satisfying Mother's claims, both individually and with regard to her own interest in the Estate of Ellen Esther Duensing.

- National does not dispute that the MSA, including Zurich's obligation to pay its $2 million policy limits as a result of the MSA, was a good faith settlement agreement. In fact, National consented to the terms of the MSA, even though it obligated National to pay an additional $800,000, over and above the $2 million liability limits of the Zurich insurance policy.[10]

---

**8.** The fact that Millers Mutual's payment was a *good faith* effort to settle a claim against an insured was crucial to the analysis in that case as it is in our ruling today. It is undisputed in the instant case that Zurich's payment to Mother in settlement of her claims was with the consent of National and was made in good faith. Our analysis today would differ if Zurich had unilaterally interpled its policy limits into the Texas trial court without negotiating the settlement of any pending claims in an attempt to secure an early exit from an extended and costly legal battle for its insured.

**9.** The *Millers* court also noted that the payment by the insurer would benefit all insureds by decreasing the total amount of liability in the underlying suit. *Millers Mutual,* 959 S.W.2d at 870.

**10.** National seems to be arguing that Mother may have misrepresented her understanding of the impact of the MSA as to any claim that could later be made by *anyone* on behalf of the Estate of Ellen Duensing in order to induce National to enter into the MSA. However, National's dissatisfaction with Mother's post-MSA position does not equate with any

- National does not dispute that Zurich, in fact, paid its policy limits of $2 million to satisfy obligations under the MSA and that such liability limit payments were made on or before December 13, 2006.
- Even after National received a ruling from the Texas trial court that was not consistent with what National believed the scope of the MSA was, National never attempted to repudiate the terms of the MSA or seek reimbursement for Zurich of its $2 million payment on National's behalf.
- Upon Zurich's good faith payment of its liability policy limits of $2 million, Zurich no longer had a potential obligation to indemnify National any further under the insurance contract.
- Just like the facts of *Millers*, the release secured by the MSA did not eliminate all pending claims in the subject litigation. But, the release did eliminate all of the claims that could be made by Mother. And, just like *Millers*, National ultimately received the benefit of a credit for Zurich's payment of its liability policy limit of $2 million.

National argues that until it received a complete release of *all* claims arising out of the Wrongful Death Lawsuit, the ordinary understanding of "settlement" had not occurred. National attempts to distinguish the facts of the present case from *Millers* by noting that Dunn, one of the defendants in *Millers*, received a complete release of liability from the plaintiff that ended Dunn's participation in the litigation. However, in a bit of a Freudian slip, National argues that the significance of this "settlement" is that "[t]his is the

ordinary understanding of paying a settlement—the settled matter is over, the insured is released, and the insured no longer needs a defense against *the party that settled and was paid.*" (Emphasis added.)

This, of course, is precisely what happened in the instant case. As a result of the MSA, the matter of Mother's claims in the Wrongful Death Lawsuit were settled and over, National was released, and National no longer needed a defense against "the party that settled and was paid" (i.e. Mother).

Simply put, National cannot distinguish the facts of the present case from the facts of the *Millers* case. Nor can National escape the holding of *Millers* today.

It is undisputed that Zurich, in good faith, exhausted the insurance contract's policy limits by "payment" of $2 million no later than December 13, 2006. As a matter of law, Zurich's "payment" was made in "settlement" of Mother's claims, both individually and as a representative of the Estate of Ellen Esther Duensing. As a matter of law, Zurich had no further duty to defend National in any continuing liability litigation after December 13, 2006. It is undisputed that $85,916.10 represents half of the ALAE costs incurred by National as of December 13, 2006, and it is undisputed that Zurich has paid that sum to National. Thus, as a matter of law, Zurich has satisfied all of its contractual obligations under the insurance contract.

## Conclusion

The material and undisputed facts demonstrate that Zurich is entitled to judgment as a matter of law. Thus, the trial

suggestion that Zurich acted in bad faith. To the contrary, National not only consented to the MSA, it demanded that Zurich tender and pay its policy limit of $2 million in liability

coverage—which Zurich did. By any definition, when Zurich paid its policy limit at the direction of its insured, Zurich was acting in good faith on behalf of its insured.

court's judgment in favor of Zurich is affirmed.

THOMAS H. NEWTON and ALOK AHUJA, Judges, concur.