George W. VEST, Jr., as Trustee of the George W. Vest Jr. Living Trust, et al., Respondents,

v.

KANSAS CITY HOMES, L.L.C., Appellant.

No. WD 69862.

Missouri Court of Appeals, Western District.

May 5, 2009.

Kelly C. Tobin, Kansas City, MO, Counsel for Appellant.

Stewart M. Stein and Megan McCurdy, Kansas City, MO, Counsels for Respondent.

Before JAMES EDWARD WELSH, P.J., VICTOR C. HOWARD, and ALOK AHUJA, JJ.

JAMES EDWARD WELSH, Presiding Judge.

Kansas City Homes, L.L.C., (KC Homes) appeals the circuit court's grant of summary judgment in favor of George W. Vest, as Trustee of the George W. Vest Jr. Living Trust; Ardeth A. Vest, as Trustee of the Ardeth A. Vest Living Trust; Genevieve V. Carroll; and John D. Carroll[1] in an action for breach of contract and specific performance of two real estate contracts. KC Homes contends that the circuit court erred in issuing summary judgment in favor of the Vests and Carrolls on their breach of contract claims because the handwritten contract provisions prevail over the typeset provisions of the real estate contract. KC Homes also contends that the circuit court erred in the contempt portion of its specific performance judgment because no evidence supported the circuit court's finding that the Vests' and the Carrolls' property was

---

1. We refer to the respondents collectively as the Vests and the Carrolls.

worth $1,000,000 or that the Vests and the Carrolls suffered losses of $881,267.64. We reverse the circuit court's grant of summary judgment and remand for further proceedings.

This case involves two real estate contracts in which KC Homes elected not to proceed with completing the purchase of two separately owned but contiguous tracts of land in Jackson County, Missouri. The Vests owned one tract of 40 acres of land, and the Carrolls owned the other tract of 40 acres of land. KC Homes was owned in equal shares by David Ward and Randy Colson. Ward and Colson also owned Mid–Missouri Farms, L.L.C., and Ward owned Ward Development and Investment Company.

On March 16, 2005, KC Homes entered into two separate contracts, one with the Vests and the other with the Carrolls, to purchase their land. KC Homes wanted to purchase both tracts simultaneously for development as a residential subdivision with approximately 256 lots. KC Homes agreed to pay $750,000 for each of the properties, for a total of $1.5 million. The contracts provided for closing on or before December 31, 2005. The typewritten contracts contained the following relevant terms:

> 17. INSPECTION AND DUE DILIGENCE: Buyer may within ____, calendar days (90 days if left blank) (the "Inspection and Due Diligence Period") *after* the Effective Date of this Contract, at Buyer's expense, have property inspected and may conduct due diligence with regulatory agencies, governmental agencies, marketing firms, engineering firms and other authorities to determine the suitability of the Property for the intended use by Buyer[.]
>
> *Buyer acknowledges that such inspections may not identify deficiencies in inaccessible areas of the Property.*

> a. ACCESS TO PROPERTY, RE–INSPECTIONS, DAMAGES AND REPAIRS. Seller shall provide Buyer reasonable access to the Property to conduct the inspections, re-inspections, inspection of any corrective measures completed by Seller and/or final walk through prior to Closing. Buyer shall be responsible and pay for any damage to the Property resulting from the inspection(s).

> b. WHAT IF BUYER DOES NOT CONDUCT INSPECTIONS? If Buyer does not conduct inspections, Buyer shall have waived any right to cancel or re-negotiate this Contract pursuant to the inspection provisions.

> c. WHAT IF BUYER DOES NOT GIVE TIMELY NOTICE OF UNACCEPTABLE CONDITIONS? If Buyer conducts inspections, but fails to notify Seller of Unacceptable Conditions prior to the expiration of the Inspection Period, Buyer shall have waived any right to cancel or re-negotiate this Contract pursuant to these inspection provisions.

> d. WHAT IS *NOT* AN UNACCEPTABLE CONDITION? The following items *shall not be considered Unacceptable Conditions and cannot be used by Buyer as a reason to cancel or re-negotiate this Contract:*

> e. WHAT IS AN UNACCEPTABLE CONDITION? An Unacceptable Condition is *any condition* identified in a written inspection report prepared by an independent qualified inspector of Buyer's choice, which

condition is unacceptable to Buyer and not otherwise excluded in this Contract.

f. WHAT IF BUYER'S INSPECTIONS REVEAL UNACCEPTABLE CONDITIONS? If Buyer's inspections reveal Unacceptable Conditions Buyer may do any *one* of the following:

(1) ACCEPT THE PROPERTY "AS IS". Buyer may notify Seller that the inspections are satisfactory or do nothing. In either case, Buyer will have waived any right to cancel or re-negotiate due to any Unacceptable Conditions; or

(2) CANCEL THIS CONTRACT by notifying Seller *in writing WITHIN THE INSPECTION PERIOD;* or

(3) OFFER TO RENEGOTIATE with Seller by notifying Seller *in writing WITHIN THE INSPECTION PERIOD* identifying the Unacceptable Conditions.

*BUYER'S NOTICE OF CANCELLATION OF OFFER TO RENEGOTIATE TERMINATES THE INSPECTION PERIOD AND MUST BE ACCOMPANIED BY THE WRITTEN REPORT(S) OF THE INDEPENDENT QUALIFIED INSPECTOR(S) WHO CONDUCTED THE INSPECTION(S).*

g. RESOLUTION OF UNACCEPTABLE CONDITIONS. Buyer and Seller shall have _____ (*5 if left blank*) after Seller's receipt of Buyer's Offer to Re-negotiate (the "Re-negotiation Period"), to reach an agreement resolving the Unacceptable Conditions. *Any of the following* executed *and* delivered to the other party or other party's agent *prior to the expiration of the Re-negotiation Period shall constitute such an agreement:*

(1) An amendment signed by Buyer and Seller resolving the Unacceptable Conditions; or

(2) A written statement *signed by Buyer* accepting the Property "as is" without correction of any Unacceptable Conditions; or

(3) A written statement *signed by Seller* agreeing to do everything requested by Buyer in Buyer's Offer to Re-negotiate.

If no agreement resolving the Unacceptable Conditions is reached as provided above, *prior to the expiration of the Re-negotiation Period,* then after expiration of the Re-negotiation Period, either party may cancel this Contract by written notice to the other.[2]

Paragraph 18 of the contracts, titled "ADDITIONAL TERMS AND CONDITIONS," provided lines for additional handwritten terms to be inserted. Handwritten in the Vest contract were these additional terms and conditions: "SEE EXHIBIT 'A'[3] CONTINGENT UPON BEING ANNEXED INTO CITY GRAIN VALLEY, MO. CITY APPROVAL OF SEWER PLANS." Handwritten in the Carroll contract were these additional terms and conditions: "SEE EXHIBIT 'A'[4] CONTINGENT UPON BEING ANNEXED INTO GRAIN VALLEY, MO.: CITY APPROVE SEWER PLANS (GRAIN VALLEY, MO.)."

**2.** The parties did not fill in any of the blanks for Paragraph 17.

**3.** Exhibit A listed additional terms which neither party argues are relevant here.

**4.** *See* note 3.

Shortly before December 7, 2005, the Vests' attorney contacted KC Homes and requested a letter to determine what needed to be done for closing so that he could begin working on a Section 1031 tax exchange[5] for the Vests. He also requested moving the closing date from December 31, 2005, to December 30, 2005.

On December 7, 2005, David Ward on behalf of Ward Development assigned all of its rights in the Vests' and the Carrolls' real estate contracts to Mid–Missouri Farms. Apparently, at one time, real estate contracts identifying Ward Development as the buyer of the Vests' and the Carrolls' property were presented to the Vests and Carrolls, but these contracts were never signed or accepted by the Vests or the Carrolls. The contracts signed by the Vests and the Carrolls listed the buyer as "Kansas City Homes & or Assigns." The assignments by Ward Development to Mid–Missouri Farms did not mention KC Homes.

Moreover, on December 7, 2005, David Ward, on behalf of Mid–Missouri Farms, sent the Vests' attorney a letter, which said: "This is to confirm that we agree that all contingencies to the contract for the sale of the Vest property have been met by the City of Grain Valley. Mid–Missouri Farms, LLC plans to close on or before December 30, 2005." Although the Carrolls did not receive a similar letter, Ward said that he intended the concepts of the letter to apply to the Carrolls' contract too.

On December 15, 2005, the Carrolls executed a Warranty Deed conveying their property to Mid–Missouri Farms, and on December 16, 2005, the Vests executed a Trustee's Deed conveying their property to Mid–Missouri Farms. These deeds, however, were never delivered or recorded.

Sometime in December, Ward and Alan Michaels of LHE Engineering attended an informal meeting in Grain Valley to discuss the sewer plans for the development on the Vests' and the Carrolls' property. City officials informed Ward and Michaels that KC Homes' proposed self-contained sewer plan designed to service only the 80 acre proposed development would not be allowed and that KC Homes would have to change the sewer system to a regional based sewer system designed to serve a 1,400 acre regional basin at an additional cost of at least $400,000 to $500,000.

When told that a more elaborate and substantially more expensive sewer system would be required, the real estate agent telephoned and informed the Vests and the Carrolls that the sale would not close. On December 22, 2005, KC Homes notified the Vests and the Carrolls in writing that it would not proceed with the purchase of their property due to the sewer plan contingency in the real estate contracts and requested the return of its escrow money. The Vests' attorney then took steps to stop a purported purchase of property he was intending on using for the Vests in the Section 1031 exchange transaction. On the same day the cancellation notice was sent by KC Homes, the Vests' attorney sent a facsimile transmission to KC Homes' attorney stating: "Copy of documents received via fax from KC Homes on 12–7–05. We expect to close on 12–30–05." The December 7, 2005 letter from Ward on behalf of Mid–Missouri Farms and the assignment documents whereby Ward Development assigned all of its rights in the real estate contracts to Mid–Missouri Farms

---

**5.** Speaking generally, a Section 1031 exchange permits the seller of certain types of property to defer taxation of any capital gain in the sale by reinvesting the sales proceeds in property of a like kind. See 26 U.S.C. § 1031.

were attached and sent as a part of that facsimile transmission.

When KC Homes failed to close on the real estate transactions, the Vests and the Carrolls sued KC Homes, Ward Development, and Mid–Missouri Farms asserting a breach of contract and seeking alternative remedies of specific performance and damages. KC Homes, Ward Development, and Mid–Missouri Farms filed an answer to the Vests' and the Carrolls' petition and counterclaimed seeking a return of the escrow monies.

On September 27, 2007, the Vests and the Carrolls filed a motion for summary judgment seeking a judgment: (1) that KC Homes continued to be liable under the contracts despite the purported assignment of the contracts by Ward Development to Mid–Missouri Farms, and (2) that KC Homes waived its right to rely upon the handwritten contingencies in the contracts by not timely notifying the Vests and the Carrolls within the ninety day "Inspection and Due Diligence" period provided for in paragraph 17 of the contracts. On November 2, 2007, KC Homes and Ward Development filed a motion for summary judgment asserting that they should be dismissed because they had assigned all of their rights in the real estate contracts to Mid–Missouri Farms.

On May 6, 2008 the circuit court granted the Vests' and the Carrolls' motion for summary judgment. The circuit court ordered (1) the title company to pay over the $20,000 earnest money to the Vests and the Carrolls, (2) the Vests and the Carrolls to execute warranty deeds conveying titles of their respective properties to KC Homes, and (3) KC Homes to pay the Vests and the Carrolls $1,881,267.64, which included the purchase price balance of $1,480,000.00, prejudgment interest of $323.257.64, and attorneys' fees and ex-

penses of $78,010.00. The court's judgment also stated:

> *In the event* [KC Homes] fails to tender payment [within 30 days of entry of this judgment, or no later than May 22, 2008, KC Homes] shall be in contempt and [the Vests and the Carrolls] shall withdraw their deeds from First American Title Company without further order of this Court and shall recover all rights and title to the Property. [The Vests and the Carrolls] must thereafter credit [KC Homes] with the sum of $1,000,000.00 which this Court finds to be the current market value of the land herein at issue. [The Vests and the Carrolls] immediately issue execution therein for the balance of said judgment[.]

Further, the judgment acknowledged that the Vests and the Carrolls were entitled to recover post judgment interest at the statutory rate. The circuit court also dismissed Ward Development and Mid–Missouri Farms from the action, having found that KC Homes did not assign its rights or obligations under the real estate contracts to Ward Development and Mid–Missouri Farms. KC Homes appeals.

When considering appeals from summary judgments, we review the record in the light most favorable to the party against whom judgment was entered, and we afford that party the benefit of all reasonable inferences. *ITT Commercial Fin. Corp. v. Mid–Am. Marine Supply Corp.,* 854 S.W.2d 371, 376 (Mo. banc 1993). We review the circuit court's granting of a summary judgment *de novo. Id.* "The propriety of summary judgment is purely an issue of law." *Id.* Because the circuit court's judgment is based on the record submitted and the law, we need not defer to the circuit court's order granting summary judgment. *Id.* We will affirm the circuit court's grant of summary judg-

ment if no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. *Id.* at 380.

■ In its first point on appeal, KC Homes contends that the circuit court erred as a matter of law in concluding that KC Homes waived its right to cancel the real estate contracts because it failed to perform due diligence in receiving approval from Grain Valley of its proposed sewer system within the ninety day "Inspection and Due Diligence" period provided for in paragraph 17 of the contracts. We agree.

■ The propriety of granting summary judgment in this case turns upon the construction of the two real estate contracts between KC Homes and the Vests and the Carrolls. " 'The cardinal rule in the interpretation of a contract is to ascertain the intention of the parties and to give effect to that intention.' " *J.E. Hathman, Inc. v. Sigma Alpha Epsilon Club,* 491 S.W.2d 261, 264 (Mo. banc 1973) (citation omitted). "The 'intent of the parties . . . is determined based on the contract alone unless the contract is ambiguous.' " *Ethridge v. Tierone Bank,* 226 S.W.3d 127, 131 (Mo. banc 2007) (quoting *Trimble v. Pracna,* 167 S.W.3d 706, 714 (Mo. banc 2005)). "[W]here the contract is ambiguous, the intent of the parties must be established by extrinsic evidence and so a question of fact arises as to the intent of the parties to its meaning. . . ." *Chadwick v. Chadwick,* 260 S.W.3d 421, 425 (Mo.App.2008). "Summary judgment, therefore, is only appropriate in contract cases where there is no ambiguity and the apparent meaning of contract terms can be determined within the four corners of the document." *Id.*

■ " '[A] contract is only ambiguous, and in need of a court's interpretation, if its terms are susceptible to honest and fair differences.' " *Ethridge,* 226 S.W.3d at 131 (citation omitted). "An ambiguity ex-

ists when there is duplicity, indistinctness, or uncertainty in the meaning of the language in the [contract]. Language is ambiguous if it is reasonably open to different constructions." *Gulf Ins. Co. v. Noble Broad.,* 936 S.W.2d 810, 814 (Mo. banc 1997). " 'A contract is not ambiguous merely because the parties disagree as to its construction.' " *Ethridge,* 226 S.W.3d at 131 (citation omitted).

Both parties argue that the provisions of the real estate contracts at issue are not ambiguous. The Vests and the Carrolls assert that Paragraph 17 and 18 of the contracts are not ambiguous and that, pursuant to Paragraph 17 of the contracts, KC Homes had ninety days to satisfy the stated contingencies in Paragraph 18. The Vests and the Carrolls note that Paragraph 17 clearly provides that KC Homes had ninety days from the date of the contracts to conduct due diligence with regulatory agencies, governmental agencies, and engineering firms to insure that the properties were suitable for KC Homes' intended purpose. According to the Carrolls and the Vests, during the ninety-day due diligence period, KC Homes had the opportunity to utilize its engineer and to inquire of the City of Grain Valley to determine whether its plan for a sewer system would meet with the City's approval. The Carrolls and the Vests contend, therefore, that because KC Homes did not perform its due diligence within ninety days, the contracts provide that KC Homes waived any right to cancel or renegotiate the contracts.

KC Homes argues, on the other hand, that, an irreconcilable conflict exists between the printed provisions and the handwritten provisions, and, therefore, the handwritten provisions should prevail. *Mews v. Charlie Chan Publ'g Co.,* 884 S.W.2d 109, 111 (Mo.App.1994). KC Homes claims that an interpretation that

the handwritten contingencies contained in Paragraph 18 come within the time frames of paragraph 17 results in not giving any effect to the handwritten contingencies and renders them a nullity. KC Homes asserts that, if the printed language of Paragraph 17 can be construed to include annexation and city approval of sewer plans, Paragraph 18 would be redundant, and there would be no logical reason for the parties to have separately specified that the purchase was contingent upon annexation and approval of sewer plans by Grain Valley. KC Homes contends that it had until closing to satisfy the Paragraph 18 contingencies and that, since the contingencies were not met by closing, it could cancel the contracts at that time.

We find that these terms of the contracts are " 'susceptible to honest and fair differences' " and are, therefore, ambiguous. *Ethridge*, 226 S.W.3d at 131 (citation omitted). Paragraphs 17 and 18 are reasonably open to different constructions. It is plausible that the parties intended for the ninety-day due diligence period to apply to the written contingencies, but it is equally plausible that the parties did not so intend.

We find this especially true because, although Paragraph 17 states that the buyer may within ninety days conduct "due diligence with regulatory agencies, governmental agencies, marketing firms, engineering firms and other authorities to determine the suitability of the Property for the intended use by Buyer," Paragraph 17 concerns primarily inspections for "unacceptable conditions" and the consequences a buyer may suffer if the buyer fails to notify the seller of unacceptable conditions prior to the expiration of the ninety-day inspection period. Paragraph 17(e) defines an "unacceptable condition" as: "*any condition* identified in a written inspection

report prepared by an independent qualified inspector of Buyer's choice, which condition is unacceptable to Buyer and not otherwise excluded in this Contract." Is a city's failure to approve sewer plans an "unacceptable condition" as that term is used in Paragraph 17? If so, pursuant to Paragraph 17(c), if KC Homes failed to notify the Vests and the Carrolls of the unacceptable condition prior to the expiration of the inspection period, KC Home waived the right to cancel or re-negotiate the contracts. If it is not an "unacceptable condition," then Paragraph 17(c) would not apply to the contingencies in Paragraph 18. The meaning of the language of the contract is uncertain given its use of the due diligence requirement combined with the unacceptable conditions requirements.

Further, Paragraph 18 is entitled "Additional Terms & Conditions." Such may imply that it contains terms and conditions in addition to those contained in Paragraph 17 and the other paragraphs, but, because of the ambiguous nature of the contracts, we cannot discern what the parties intended.

We are unable to ascertain the intent of the parties as to the apparent meaning of the contract terms from the four corners of the contracts. Thus, a question of fact arises as to the intent of the parties as to the meaning of the terms, and extrinsic evidence is necessary to determine the meanings. The circuit court, therefore, erred in entering summary judgment in favor of the Vests and Carrolls. We reverse the circuit court's judgment and remand for further proceedings.[6]

All concur.

---

6. Because we reach this conclusion, we need not address KC Homes' second point on ap-

peal, in which it contends that the circuit court erred in the contempt portion of its specific performance judgment because no evidence supported the circuit court's finding that the Vests' and the Carrolls' property was worth $1,000,000 or that the Vests and the Carrolls suffered losses of $881,267.64. Moreover, we deny the Vests' and the Carrolls' motion for attorneys' fees on appeal.