Ryan J. FISCHER, Appellant,

v.

FIRST AMERICAN TITLE INSURANCE COMPANY, Respondent.

No. WD 74633.

Missouri Court of Appeals, Western District.

Sept. 18, 2012.

Motion for Rehearing and/or Transfer to Supreme Court Denied Oct. 25, 2012.

Application for Transfer Denied Jan. 29, 2013.

Vincent F. O'Flaherty and Courtney E. Noll, Kansas City, MO, for Appellant.

William L. Sauerwein and Grant J. Mabie, St. Louis, MO, for Respondent.

Before Division II: JOSEPH M. ELLIS, Presiding Judge, and ALOK AHUJA and MARK D. PFEIFFER, Judges.

MARK D. PFEIFFER, Judge.

A jury found in favor of Ryan J. Fischer ("Fischer") on his claims against First American Title Insurance Co. ("First American") for breach of the contractual terms of a title insurance policy and on his derivative claim for vexatious refusal to pay. First American filed a motion for a judgment notwithstanding the verdict, which was granted by the Circuit Court of Jackson County, Missouri. Fischer appeals.

We affirm.

**Factual and Procedural Background**

Fischer bought a house at 2141 Belleview Avenue, in Kansas City, Missouri. The house located at 2141 Belleview was situated on Lots 9 and 10 in Block 1 of Thayer's Addition ("Lots 9 and 10"). In 2009, Fischer bought a house at 2139 Belleview Avenue, which was located on Lot 8 ("Lot 8"), adjacent to Lot 9, also in Block 1 of Thayer's Addition.

Fischer purchased title insurance for Lot 8 from First American ("the Title Policy"). The Title Policy covered any loss or damage for any "defect in or lien or

encumbrance on the Title" to Lot 8, subject to the exceptions from coverage, which were listed in Schedule B.

In pertinent part, the Schedule B exceptions to the Title Policy exclude coverage for losses or damages that arise by reason of "[r]ights or claims of parties in possession not shown by the Public Record" ("parties in possession exception").

Fischer's plan for Lot 8 was to tear down the existing structures on Lot 8 and build a pool. As part of the project, Fischer tore down a chain link fence that had been built near the northern edge of Lot 8, which was closest to the boundary line of Lot 7—owned by Teresa Rivera ("Rivera"). Fischer then hired a surveyor to mark the boundary lines of Lot 8, and the results of that survey suggested that the fence had been located approximately 3 feet and 7 inches inside the property line boundary for Lot 8 ("the Disputed Parcel").

The fence was originally built in 1952 and was made of wood. Subsequently, Banks Stevenson, owner of Lot 8 at the time, converted the wood fence to a chain link fence, and he used the fence to grow grapevines.[1]

Rivera's grandparents owned Lot 7 beginning in the 1940s. Rivera's father owned Lot 7 from 1958 until deeding Lot 7 to his daughter, Rivera, in 1992. Rivera's father used the Disputed Parcel for "picnics and family gatherings" and mowed the Disputed Parcel. After Rivera acquired Lot 7 from her father, she would later testify in a separate lawsuit that she continued to visibly and openly possess, control, and use the Disputed Parcel in like fashion as her father had done at all times prior to Fischer's purchase of Lot 8.

In the summer of 2009, Fischer began excavation for the pool and buried utility lines on Lot 8, including the Disputed Parcel.

In October 2009, Rivera filed a two-count petition against Fischer, asserting adverse possession and boundary by acquiescence claims relating to the Disputed Parcel ("the Rivera lawsuit"). Fischer tendered the defense of the Rivera lawsuit to First American and, in the event that he lost, to indemnify him under the Title Policy. First American rejected the tendered defense of the Rivera lawsuit, citing the parties in possession exception. Fischer then provided First American photos of the chain link fence on Lot 8 that were taken prior in time to him tearing the fence down and again tendered the defense of the Rivera lawsuit to First American. First American again rejected the tendered defense for, among other reasons, the parties in possession exception.

■ Fischer retained legal counsel and incurred legal fees in excess of $46,000 unsuccessfully defending the Rivera lawsuit.[2]

---

1. This may explain the placement of the fence as Stevenson may have wanted access to both sides of the fence—without the necessity of trespassing on his neighbor's property on Lot 7—to maintain his grapevines and harvest his grapes.

2. In the Rivera lawsuit, the circuit court concluded that, as of 1962, the Disputed Parcel had been adversely possessed by Rivera's predecessors in interest through a hostile claim of ownership that was actual, open, exclusive, and continuous for the requisite ten-year period of time required for a claim of adverse possession and that Rivera had acquired ownership of the Disputed Parcel upon the conveyance of Lot 7 to her in 1992. Relying in part upon Rivera's prayer for relief that sought "such other relief as this Court deems just and proper," the circuit court exercised its equitable powers to divest Rivera of any ownership right in the Disputed Parcel by ordering Fischer to pay Rivera $10,000 in exchange for the Disputed Parcel. Of course, the prayer for relief in a lawsuit is not a

Based on First American's refusal to defend Fischer in the Rivera suit, Fischer brought the present lawsuit against First American. Fischer's petition made two claims: (1) that First American breached the contractual terms of the Title Policy by failing to defend and indemnify him in the Rivera lawsuit, and (2) that First American was vexatious in its refusal to defend and indemnify Fischer. The case proceeded to a jury trial in the Circuit Court of Jackson County, Missouri ("trial court").

The jury entered judgment in Fischer's favor, awarding him $57,971.71 on his breach of insurance policy claim and $24,000 on his vexatious refusal to pay claim. First American filed a motion for a judgment notwithstanding the verdict ("JNOV").

The trial court granted First American's JNOV motion. In so doing, the trial court explained:

> For Count I of his Petition, [Fischer] pleaded a written contract for title insurance with [First American] that he alleged should have entitled him to a legal defense of, and indemnification against, any judgment awarded in an underlying lawsuit styled *Rivera v. Fischer* then pending in the Jackson County Circuit Court as No. 0916–CV35127. However, the First Amended Petition in the underlying case, the Title Policy language, and information known by [First American] at the time coverage was denied, showed clearly that the pleaded claims in the underlying case were within the language of an unambiguous exception to coverage under the

Title Policy because the plaintiff in the underlying case, [Teresa] Rivera, asserted an adverse title because of matters not in the Public Record. Thus Count I fails. Count II is dependent on Count I and therefore also fails.

The trial court vacated the jury's verdict and entered judgment in First American's favor.

Fischer appeals.

## Standard of Review

■■■■ We review the trial court's grant of a JNOV motion in favor of the defendant *de novo* and will determine whether the plaintiff made a submissible case. *Koppe v. Campbell*, 318 S.W.3d 233, 239 (Mo.App. W.D.2010). "To make a submissible case, a plaintiff must present substantial evidence that tends to prove the facts essential to plaintiff's recovery." *Id.* (internal quotation omitted). Evidence is viewed in a light most favorable to the jury's verdict, and the reviewing court must give the prevailing party all reasonable inferences from the verdict. *Id.* However, the interpretation of an insurance policy, as with any other contract, "is generally a question of law, particularly in reference to the question of coverage." *D.R. Sherry Constr., Ltd. v. Am. Fam. Mut. Ins. Co.*, 316 S.W.3d 899, 902 (Mo. banc 2010). Further, "[t]he issue of coverage becomes a jury question only when the court determines that the contract is ambiguous and that there exists a genuine factual dispute regarding the intent of the parties." *Id.* "[W]e will affirm the trial

---

separate cause of action, *State ex rel. Barker v. Tobben*, 311 S.W.3d 798, 800–01 (Mo. banc 2010), *La Presto v. La Presto*, 285 S.W.2d 568, 571 (Mo.1955); but rather, the prayer for relief merely serves as an equitable vehicle for the circuit court to announce the remedy for the claims asserted in the allegations of the lawsuit. *Barker*, 311 S.W.3d at 800–01. Giv-

en the adverse possession conclusions drawn by the circuit court in its judgment in the Rivera lawsuit, it is clear that the circuit court was announcing an equitable remedy in response to Rivera's successful adverse possession claim from her lawsuit. Neither party appealed from the Rivera lawsuit judgment.

court's [JNOV] ruling if the trial court's ruling was proper for any reason, even if its assigned grounds were wrong." *Koppe*, 318 S.W.3d at 240 (internal quotation omitted).

## Point I—The Title Policy JNOV Motion

In his first point, Fischer argues that the trial court erred in granting First American's JNOV motion because he had established a prima facie case for breach of the Title Policy and it was a question of fact whether the parties in possession exception applied.

### Parties in Possession Exception to Coverage

 The Title Policy covers claims for "[a]ny defect in or lien or encumbrance on the [insured's] title." In the Rivera lawsuit, Rivera claimed she had ownership rights to the Disputed Parcel on Fischer's property, which would be a defect or encumbrance on his title to Lot 8. While the insured bears the burden of proving coverage under an insurance policy, *Truck Ins. Exch. v. Prairie Framing, LLC*, 162 S.W.3d 64, 80 (Mo.App. W.D.2005), First American does not dispute that Rivera's Disputed Parcel ownership claim falls under coverage of the Title Policy were it not for the exceptions to coverage. The dispute lies in whether the Rivera lawsuit claims fall within an exception to coverage under the Title Policy. The insurer bears the burden of proving the applicability of its policy exclusion. *Id.* at 80. The Title Policy's parties in possession exception to coverage states:

> This policy does not insure against loss or damage, and [First American] will not pay costs, attorney's fees or expenses that arise by reason of ... [r]ights or claims of parties in possession not shown by the Public Record.

 Fischer argues that the parties in possession exception is ambiguous because it fails to define "parties in possession," and the issue was thus properly submitted to the jury. However, "[t]he failure of a policy to define a term does not, in and of itself, render it ambiguous." *Trainwreck W. Inc. v. Burlington Ins. Co.*, 235 S.W.3d 33, 40 (Mo.App. E.D.2007). "'An ambiguity exists when there is duplicity, indistinctness, or uncertainty in the meaning of the language in the [contract].'" *Vest v. Kansas City Homes, L.L.C.*, 288 S.W.3d 304, 310 (Mo.App. W.D. 2009) (quoting *Gulf Ins. Co. v. Noble Broad.*, 936 S.W.2d 810, 814 (Mo. banc 1997)). "[W]hen a policy does not define a term, a court is free to give the term a reasonable construction." *Dibben v. Shelter Ins. Co.*, 261 S.W.3d 553, 557 (Mo.App. W.D.2008). In so doing, "the trial court must consider the whole document and the natural and ordinary meaning of the language." *Maritz Holdings, Inc. v. Fed. Ins. Co.*, 298 S.W.3d 92, 99 (Mo.App. E.D. 2009).

Though no Missouri case has previously discussed the "party in possession" exception, we have not found case precedent—nor has Fischer cited us to any such precedent—concluding that this policy exception to coverage is ambiguous. To the contrary, there are numerous cases across the country and treatises that conclude the opposite. *Zimmerman v. Chicago Title Ins. Co.*, 28 S.W.3d 584, 586 (Tex.App. 1999) (concluding that the parties in possession exception is "a standard exception from coverage specifically relating to claims such as adverse possession"); *Boyadjiev v. Transnation Title Ins. Co.*, No. 257618, 2005 WL 3556156 (Mich.Ct.App. Dec. 29, 2005) (parties in possession exception to coverage found unambiguous and designed to except from coverage unrecorded property possessory claims such as

adverse possession); *Cheverly Terrace P'ship v. Ticor Title Ins. Co.*, 100 Md.App. 606, 642 A.2d 285 (1994) (parties in possession standard exception to coverage unambiguously excepting from coverage unrecorded property possessory claims such as adverse possession, eliminating any duty to defend title policy insured, even where adverse possession claim is defeated); *see also Panciocco v. Lawyers Title Ins. Corp.*, 147 N.H. 610, 794 A.2d 810 (2002); *Smith v. McCarthy*, 195 S.W.3d 301 (Tex.App. 2006); 11 LEE R. RUSS & THOMAS F. SEGALLA, COUCH ON INSURANCE § 159:70 (2005).

We will not create an ambiguity where one does not exist. *Eldridge v. Columbia Mut. Ins. Co.*, 270 S.W.3d 423, 426 (Mo. App. W.D.2008). None exists here. The plain and ordinary meaning of the parties in possession exception for coverage is:

> The title insurance policy does not insure against rights or claimed rights of parties asserting possession to property via means outside of any public record denominating such possessory interest in the property.

### Duty to Defend

■ First American's duty to defend Fischer is distinct from First American's duty to indemnify Fischer, and it is broader than its duty to indemnify him. *Penn–Star Ins. Co. v. Griffey*, 306 S.W.3d 591, 596 (Mo.App. W.D.2010). Yet, "[w]here

there is no duty to defend, there is no duty to indemnify." *Trainwreck W.*, 235 S.W.3d at 44 (internal quotation omitted).

■ An insurer's duty to defend is triggered when the insured is exposed to potential liability "based on the facts known at the outset of the case, no matter how unlikely it is that the insured will be found liable."[3] *Truck Ins. Exch.*, 162 S.W.3d at 79 (internal quotation omitted). "To extricate itself from a duty to defend the insured, the insurance company must prove that there is *no possibility* of coverage." *Id.* (internal citation omitted). If the facts the insurer knew or could have known from a reasonable investigation "are *potentially* within the scope of the policy's coverage," then the insurer has a duty to defend. *Id.; see also Penn–Star Ins.*, 306 S.W.3d at 597 (noting that "if the allegations and ascertainable facts establish any *potential* or *possible* coverage, then the insurer has a duty to defend.").

■ Notably, though, "liability" is not the sole question; rather, the pertinent question is whether the insured is subject to liability from a claim(s) that falls under the coverage provisions of the insurance policy based on either the allegations in the petition or the known and ascertainable facts. *Trainwreck W.*, 235 S.W.3d at 44. Therefore, even though an investigation of the facts may have led First American to believe that Fischer would not be liable to Rivera,[4] its duty to defend would

---

**3.** The duty to indemnify, on the other hand, "is determined by the facts as they are established at trial or as they are finally determined by some other means, [such as] summary judgment." *Penn–Star Ins. Co. v. Griffey*, 306 S.W.3d 591, 601 (Mo.App. W.D. 2010) (internal quotation omitted).

**4.** An insurer has a duty to defend "even if that suit on its face was frivolous," so long as the underlying suit alleges a claim that is "potentially covered by the policy, no matter how attenuated, frivolous, or illogical that allega-

tion may be." *Sheets v. Brethren Mut. Ins. Co.*, 342 Md. 634, 679 A.2d 540, 544 (1996) (cited by and reasoning adopted in *Wood v. Safeco Ins. Co. of Am.*, 980 S.W.2d 43, 53 (Mo.App. E.D.1998)); *see also Ticor Title Ins. Co. of Cal. v. Am. Res. Ltd.*, 859 F.2d 772, 775 (9th Cir.1988) ("[w]hen there is an action against an insured, and the action raises claims that come within the title insurance policy's coverage," the insurer must defend the suit, even if it is frivolous). The difference in this case is that, even if First American,

nevertheless be triggered if the allegations of the underlying petition, or an investigation of the facts, showed that Rivera's claims were potentially or possibly covered under the Title Policy.[5]

First American's duty to defend Fischer is determined (1) "initially by comparing the relevant policy provisions with the allegations of liability in the petition," and then (2) by considering facts the insurer "knew or could reasonably have ascertained" at the time the action is commenced. *Penn–Star Ins.*, 306 S.W.3d at 597. If Rivera's petition "merely alleges facts that give rise to a claim potentially within the policy's coverage, the insurer has a duty to defend." *Am. States Ins. Co. v. Herman C. Kempker Constr. Co.*, 71 S.W.3d 232, 236 (Mo.App. W.D.2002) (internal quotation omitted).

Here, Rivera's lawsuit claims were both based upon her allegations of *possession* that required *no publicly recorded documentation of ownership*. Both of Rivera's claims relating to the Disputed Parcel were based upon unrecorded yet alleged "visible and exclusive possession, control and use of the Disputed Parcel."

In the Rivera lawsuit, Rivera claimed possessory rights to the Disputed Parcel through adverse possession and/or boundary by acquiescence. The "rights" of each of these claims, however, are different. Adverse possession is a "title" claim; boundary by acquiescence is a "boundary"

claim. In the context of "title" insurance, this is a distinction with a difference.

In an adverse possession lawsuit, once adverse possession is established, the record owner—whose ownership would be shown in the public record—is divested of ownership, and the adverse possessor—whose ownership would not be shown in the public record—is vested with "title" to the land. *Kitterman v. Simrall*, 924 S.W.2d 872, 876 (Mo.App. W.D.1996).

Conversely, a boundary by acquiescence exists if there is an uncertain boundary and the landowners fix the boundary by an "agreement that is presumed as a result of long acquiescence." *Weiss v. Alford*, 267 S.W.3d 822, 827 (Mo. App. E.D.2008). In a boundary by acquiescence claim, "[a]n agreement as to a boundary line, 'may be proved by an express agreement or by acquiescence in a fence as a boundary for a period of time sufficient to evidence a mutual acceptance of the dividing line as the common boundary by the adjoining owners.'" *Shoemaker v. Houchen*, 994 S.W.2d 40, 45 (Mo.App. W.D.1999) (quoting *Conduff v. Stone*, 968 S.W.2d 200, 204 (Mo.App. S.D.1998)). Notably, acquiescence establishes a *boundary*, not *title* to land. *Id.* Once there is an express agreement or acquiescence on the part of the landowners, possession becomes adverse for the purpose of running the statute of limitations period for adverse possession.[6] *Id.*

---

mistakenly or not, believed that Rivera's suit was frivolous, her claims were still not covered claims pursuant to the unambiguous parties in possession exception to coverage under the Title Policy.

**5.** *See Cheverly Terrace P'ship v. Ticor Title Ins. Co.*, 100 Md.App. 606, 642 A.2d 285, 288 (1994) (neighboring apartment complex claimed adverse possession of land bought by a shopping center; court determined there was no duty to defend under the parties in

possession exception to the title insurance policy, noting that the "relevant question is whether there was a potential for coverage if [claimant] had been *successful* in proving the allegations in the complaint.").

**6.** Notably, in Fischer's appellate reply brief, Fischer concedes that he "does not contend in this appeal that the claim for adverse possession was covered or potentially covered." We agree. And, as discussed in our ruling today, the only way in which a boundary by acquies-

When adverse possession and boundary by acquiescence are discussed together, the importance of establishing acquiescence in the boundary *as a boundary* might be overlooked. But the distinction is critical in a case such as the present one. First, because a claim for boundary by acquiescence does not, in itself, impact *title* to land, such a claim—even if successful—cannot create a defect, lien, or encumbrance upon *title;* therefore, it does not appear that a boundary by acquiescence claim would trigger coverage under the Title Policy in the first instance. Second, the allegations of the Rivera lawsuit show that Rivera's boundary by acquiescence "ownership" claim is inextricably bound to her claim for adverse possession. The ac-

tual legal boundary between Rivera's and Fischer's properties was known. It did not need to be determined by referencing the fence boundary.[7] Rather, Rivera was claiming to have *adversely possessed* the Disputed Parcel, and the *boundary* to which there was claimed to have been an acquiescence or agreement merely defined the outer edge of the land Rivera claimed to have *adversely possessed.*[8]

Thus, pursuant to these allegations, Rivera was claiming that she and her predecessors in interest had acquired "possession" of the Disputed Parcel via adverse possession either by way of an acquiescence over time by the previous owner of Lot 7 or by open and hostile adverse pos-

cence claim can impair an insured's *title* to land is if the boundary agreed upon or acquiesced to is eventually "adversely possessed" by the party attempting to acquire *title* to the land covered within the new *boundary* line.

7. The doctrine of boundary by acquiescence appears to be a relic from the days when, perhaps due to insufficient surveying or recording methods, the actual legal boundary between two adjacent properties was often unknown or unknowable. When the actual legal boundary is unknown, it makes perfect sense to determine the legal boundary between the two properties by referencing a physical boundary, either natural (stream, ditch, etc.) or artificial (commonly a fence or hedgerow), to which the neighboring landowners agree—or acquiesce. For example, in *Kelley v. Prock*, 825 S.W.2d 896, 898 (Mo.App. S.D.1992), a piece of property was bequeathed in a will to two different relatives, the resulting two parcels to be divided along an existing road. Unfortunately, the road did not span the entire length of the property, so the actual legal boundary between the two parcels of land was unknown. *Id.* at 900. A fence, which ran along the road, continued on past the end of the road and throughout the length of the property. *Id.* The two relatives had always used the fence as their makeshift boundary dividing the properties; therefore, the court found that the fence had become the legal boundary between the two tracts of land by acquiescence of the parties. *Id.* In cases

such as these, though, the boundary by acquiescence claim does not award *title* to one party or the other. The parties already have *title* to the land; they are simply unsure of the actual legal *boundary* separating the properties.

8. This appears to be the much more common use of claims for boundary by acquiescence—that is, pairing a boundary by acquiescence claim with an adverse possession claim—consistent with the procedural pattern of the boundary by acquiescence cases cited by Fischer in his appellate briefing to this court. However, as these cases point out, using a claim for boundary by acquiescence in this context does not, by itself, establish ownership rights; rather, from the point in time that the parties *acquiesce* to the *boundary,* *possession* is deemed to be *adverse* and the clock begins to run on the adverse possession claim. *Tillman v. Hutcherson,* 348 Mo. 473, 154 S.W.2d 104, 107 (1941); *Shoemaker,* 994 S.W.2d at 45. As *Tillman* notes, using the boundary by acquiescence doctrine in adverse possession cases can actually have the effect of adding years to the ten-year possession period for adverse possession actions, *Tillman,* 154 S.W.2d at 108. This has led some courts to conclude that the use of boundary by acquiescence claims in this context has actually served to confuse the two legal principles. *See Conduff,* 968 S.W.2d at 204.

session of the Disputed Parcel. Under either theory, Rivera claimed to "possess" the Disputed Parcel by way of an ownership theory that would, by definition, *not* be recorded in public records.

Even considering the facts First American knew or could have ascertained outside the pleadings, the result is no different. The facts that First American knew or could have known included the fact that the chain link fence was built, shortly after 1952, for the purpose of growing grapes on the fence. When the fence's original use is considered, its placement makes sense: Stevenson, who built the fence for his grapevines, would probably need access to both sides of the fence to successfully maintain the grapes. It would have made little sense for him to place the fence along the actual border between Lot 7 and Lot 8—if he had done so, he would only have access to one side of his grape fence. By building the fence inside his own lot, he was able to access both sides of the fence and care for the grapes. But these facts change nothing. The only thing these facts demonstrate is that First American's insured might have had a reasonable argument in response to Rivera's possessory ownership claim. It does not change the fact that the basis of Rivera's ownership claim to the Disputed Parcel still revolved around a possessory interest in land that was not recorded in public records.

Rivera's claim of ownership to the Disputed Parcel was both based on a claim of possession to the Disputed Parcel and alleged legal theories (adverse possession and boundary by acquiescence) that would not appear in the public record; Rivera's claims were not potentially or possibly covered by the Title Policy; Rivera's claims were, as a matter of law, excepted from the Title Policy's coverage through the parties in possession exception. As a matter of law, First American's duty to defend was not triggered, and the trial court did not err in granting First American's JNOV.[9]

Point I is denied.[10]

### Point II—Vexatious Refusal to Pay

In his second point on appeal, Fischer argues the trial court erred in granting First American's JNOV motion because he made a submissible case on his claim against First American for vexatious refusal to pay an insurance claim. To establish his claim for vexatious refusal to pay, Fischer would have to prove that: (1) he had an insurance policy with First American, (2) First American refused to pay under the policy, and (3) First American's refusal was without reasonable cause or excuse. *Dhyne v. State Farm Fire & Cas. Co.*, 188 S.W.3d 454, 457 (Mo. banc 2006).

However, where an insurer had no duty to defend or indemnify under the insurance policy, there cannot be a claim for vexatious refusal to defend or indemnify. *See Valentine–Radford, Inc. v. Am. Motorists Ins. Co.*, 990 S.W.2d 47, 54 (Mo. App. W.D.1999) (declining to discuss a vexatious refusal claim after finding the insurer had no duty to defend).

Because we have concluded that the trial court correctly concluded, as a matter of

---

9. Because there is no duty to defend, there is no duty to indemnify. *Trainwreck W. Inc. v. Burlington Ins. Co.*, 235 S.W.3d 33, 44 (Mo. App. E.D.2007).

10. First American had also denied coverage based upon a survey exception. However, since we have affirmed the trial court's JNOV ruling based upon its reliance upon the parties in possession exception, it is not necessary for us to address First American's alternative theory of defense under the Title Policy.

law, that First American had no duty to defend or indemnify Fischer in the Rivera lawsuit, we likewise necessarily conclude that the trial court's ruling on Fischer's derivative vexatious refusal claim was also correct.

Point II is denied.

### Conclusion

The trial court did not err in granting First American's JNOV motion and, accordingly, the judgment of the trial court is affirmed.

JOSEPH M. ELLIS, Presiding Judge, and ALOK AHUJA, Judge, concur.